IN THE CIRCUIT COURT FOR
BALTIMORE CITY, MARYLAND

| | |
|---|---|
| **DOMINIQUE LIVERPOOL** | * |
| 933 Sedgley Rd | |
| Catonsville, MD 21228 | * |
| | |
| **Plaintiff** | * |
| | |
| **vs.** | *   **CIVIL NO:** |
| | |
| **CAESARS BALTIMORE** | * |
| **MANAGEMENT COMPANY, LLC** | |
| Ste 400 | * |
| 2711 Centerville Rd | |
| Wilmington DE 19080 | * |
| | |
| and | * |
| | |
| **CBAC BORROWER, LLC** | * |
| Ste 400 | |
| Centerville Rd | * |
| Wilmington, DE 19808 | |
| | * |
| **SERVE:** | |
| | * |
| **CSC-LAWYERS INCORPORATING** | |
| **SERVICE COMPANY** | * |
| 7 St. Paul Street | |
| Suite 820 | * |
| Baltimore, MD 21202 | |
| | * |
| and | |
| | * |
| **CAESARS LICENSE COMPANY, LLC** | |
| 1 Caesars Palace Dr | * |
| Las Vegas, NV 89109 | |
| | * |
| **D/B/A/ HORSESHOE** | |
| **CASINO BALTIMORE** | * |
| 1525 Russell Street | |
| Baltimore, MD 21201 | * |
| | |
| and | * |

RECEIVED
CIRCUIT COURT FOR
BALTIMORE CITY
2020 SEP 10  PM 12: 54
CIVIL DIVISION

1

— LAW OFFICE OF —
ABRAHAM FERNANDO CARPIO, LLC
3311 Toledo Terrace, Suite B-201
Hyattsville, MD 20782
(301) 559 8100

**JOHN DOE SECURITY GUARD 1**                    *
1525 Russell Street
Baltimore, MD 21201                              *

and                                              *

**JOHN DOE SECURITY GUARD 2**                    *
1525 Russell Street
Baltimore, MD 21201                              *

and                                              *

**JOHN DOE SUPERVISOR**                          *
1525 Russell Street
Baltimore, MD 21201                              *

and                                              *

**CAESARS GROWTH PARTNERS, LLC**                 *
1 Caesars Palace Dr
Las Vegas, NV 89109                              *

and                                              *

**CAESARS ACQUISITION COMPANY**                  *
1 Caesars Palace Dr
Las Vegas, NV 89109                              *

**SERVE:**                                       *

**JILL EATON**                                   *
1 Caesars Palace Dr
Las Vegas, NV 89109                              *

and                                              *

**CAESARS ENTERTAINMENT, INC.**                  *
100 West Liberty Street 10th Floor
Reno, NV 89501                                   *

**SERVE:**                                       *

**SIERRA CORPORATE**                             *

2

— LAW OFFICE OF —
ABRAHAM FERNANDO CARPIO, LLC
3311 Toledo Terrace, Suite B-201
Hyattsville, MD 20782
(301) 559 8100

## IN THE CIRCUIT COURT FOR
## BALTIMORE CITY, MARYLAND

**DOMINIQUE LIVERPOOL**       *
933 Sedgley Rd
Catonsville, MD 21228      *

    Plaintiff      *

**vs.**      *      **CIVIL NO:**

**CAESARS BALTIMORE**      *
**MANAGEMENT COMPANY, LLC**
Ste 400      *
2711 Centerville Rd
Wilmington DE 19080      *

and      *

**CBAC BORROWER, LLC**      *
Ste 400
Centerville Rd      *
Wilmington, DE 19808

     *

**SERVE:**      *

**CSC-LAWYERS INCORPORATING**      *
**SERVICE COMPANY**
7 St. Paul Street      *
Suite 820
Baltimore, MD 21202      *

and      *

**CAESARS LICENSE COMPANY, LLC**      *
1 Caesars Palace Dr
Las Vegas, NV 89109      *

**D/B/A/ HORSESHOE**      *
**CASINO BALTIMORE**
1525 Russell Street

RECEIVED
CIRCUIT COURT FOR
BALTIMORE CITY
2020 SEP 10 PM 12: 54
CIVIL DIVISION

FILE COPY

1

-Law Offices of Abraham F. Carpio-
3311 Toledo Terrace, Suite B 201
Hyattsville, MD 20782 * (301)-559-8100

Baltimore, MD 21201                          *

and                                          *

**JOHN DOE SECURITY GUARD 1**                *
1525 Russell Street
Baltimore, MD 21201                          *

and                                          *

**JOHN DOE SECURITY GUARD 2**                *
1525 Russell Street
Baltimore, MD 21201                          *

and                                          *

**JOHN DOE SUPERVISOR**                      *
1525 Russell Street
Baltimore, MD 21201                          *

and                                          *

**CAESARS GROWTH PARTNERS, LLC**             *
1 Caesars Palace Dr
Las Vegas, NV 89109                          *

and                                          *

**CAESARS ACQUISITION COMPANY**              *
1 Caesars Palace Dr
Las Vegas, NV 89109                          *

**SERVE:**                                   *

**JILL EATON**                               *
1 Caesars Palace Dr
Las Vegas, NV 89109                          *

and                                          *

**CAESARS ENTERTAINMENT, INC.**              *

2

100 West Liberty Street 10th Floor
Reno, NV 89501 *

**SERVE:** *

**SIERRA CORPORATE SERVICES – RENO** *
100 West Liberty Street, Suite 1150 *
Reno, NV 89501
smelendez@mcdonaldcarano.com *

Copy to: *

**PAUL GEORGESON** *
equatmann@eldoradoresorts.com
*
and
*
**EDMUND L QUATMANN**
equatmann@eldoradoresorts.com *

FILE COPY

**Defendants.** *

* * * * * * * * * * * *

**COMPLAINT AND DEMAND FOR JURY TRIAL**

COMES NOW the Plaintiff, Dominique Liverpool (hereinafter, "Liverpool"), and hereby sues Defendants Horseshoe Casino Baltimore (Caesar's License Company LLC), CBAC Borrower, LLC, Caesars Baltimore Management Company, LLC, Caesars Growth Partners, LLC, Caesars Acquisition Company, Caesars Entertainment, Inc., John Doe Security Guard 1, John Doe Security Guard 2, John Doe Supervisor, and states as follows:

-Law Offices of Abraham F. Carpio-
3311 Toledo Terrace, Suite B 201
Hyattsville, MD 20782 * (301)-559-8100

## PARTIES

1. The Plaintiff, Dominique Liverpool, is an adult citizen resident of Baltimore County, Maryland, and has sufficient contacts to warrant personal jurisdiction in this State Court.

2. The un-named individual defendants were employed as security guards (John Doe Security Guards 1 and 2) and supervisor (John Doe Supervisor) for Horseshoe Casino Baltimore at the time of the occurrence.

## Caesars License Company, LLC

3. According to a public disclosure statement filed by General Counsel for Caesars Entertainment Corporation with the Illinois Gaming Commission, Jill Eaton is a corporate officer for Caesars Entertainment. (Ex. 12). Jill Eaton filed a trade name application with the State of Maryland Department of Assessments and Taxation and registered Horseshoe Casino Baltimore under Caesars License Company, LLC in 2012, then renewed the registration August 7, 2017 (Ex. 9, 10, 14). Caesars License Company, LLC is a subsidiary of Caesars Entertainment Corporation. (Ex. 13, p. 1).

4. A search conducted April 18, 2020 on the Maryland Department of Assessments & Taxation website, shows that Jill Eaton's registration of Horseshoe Baltimore under Caesars License Company, LLC (on behalf of Caesars Entertainment Corporation) is still valid and active, and does not expire until August 7, 2022. (Ex 14). Accordingly, Caesars License Company, LLC is a proper defendant.

4

## Caesars Baltimore Management Company, LLC

5.   Caesars Baltimore Management Company, LLC is incorporated in Delaware and is a subsidiary of Caesars Entertainment Corporation. (Ex. 11; Ex. 13, p. 1). It was registered on July 14, 2011 by Jill Eaton to "[m]anage business operations and [for] any other lawful limited liability business purpose." (Ex. 11). In December 2019, "Horseshoe Casino Baltimore state[d] that its correct name is 'Caesars Baltimore Management Company, LLC[.]'" *Hayes v. Horseshoe Casino Balt.*, Civil Action No. GLR-18-2823, 2019 U.S. Dist. LEXIS 213959, at *1 n.1 (D. Md. Dec. 10, 2019). See also *Hill v. CBAC Gaming LLC*, Civil Action No. DKC 19-0695, 2019 U.S. Dist. LEXIS 213988, at *2 (D. Md. Dec. 11, 2019) ("Defendant Caesars Baltimore Management Company, LLC ('Defendant Caesars') supervises, manages, and operates casinos throughout the United States, including the Horseshoe Casino Baltimore.").

## Caesars Growth Partners, LLC, Caesars Acquisition Company, and CBAC Borrower, LLC

6.   On April 23, 2013, Caesars Entertainment Corporation[1] issued a press release announcing that "Caesars will form a new growth-oriented entity, Caesars Growth Partners, LLC (Growth Partners), to be owned by Caesars and participating Caesars stockholders." (Ex. 2, p. 1). Then, Caesars issued a press release on the casino's opening night, stating that Horseshoe Casino Baltimore is "[c]ontrolled by Caesars

---

[1] Caesars Entertainment Corporation is not named as a Defendant because it has been aquired by El Dorado thereby forming Caesars Entertainment, Inc., which is now the proper Defendant.

-Law Offices of Abraham F. Carpio-
3311 Toledo Terrace, Suite B 201
Hyattsville, MD 20782 * (301)-559-8100

Growth Partners, LLC, a joint venture between Caesars Acquisition Company [ ], and Caesars Entertainment Corporation [...] Horseshoe Baltimore is managed by a subsidiary of Caesars Entertainment Corporation." (Ex. 3, pp. 1-2).

7.  The press release also states that "Horseshoe Casino Baltimore [was] developed by CBAC Borrower, LLC [...] [and] is controlled by Caesars Growth Partners, LLC (CGP), a joint venture between Caesars Entertainment Corporation and Caesars Acquisition Company[.]" Id. Caesars Entertainment Corporation's 2017 report with the Securities and Exchange Commission clarifies that "CBAC Borrower, LLC ('CBAC'), [is] the owner of the Horseshoe Baltimore and subsidiary of a joint venture among Caesars Growth Partners, LLC, a joint venture between Caesars Entertainment Corporation ('CEC') and Caesars Acquisition Company[.]" (Ex. 4, p. 2).

8.  Moreover, Caesars Entertainment Corporation had already affirmed in an earlier press release that "Caesars and its affiliated companies will continue to manage [...] Horseshoe Baltimore allowing these properties to be part of the Total Rewards network and benefit from Caesars' shared services operating model." (Ex. 2, p. 1). Furthermore, Caesars Entertainment Corporation's 2015 Annual Report with the Securities and Exchange Commission describes its organizational structure at length and affirmatively states that that Horseshoe Baltimore Casino is owned by Caesars

6

Growth Partner, LLC.[2] (Ex. 5). Caesars Entertainment features Horseshoe casino Baltimore on its website, as one of the casinos that it owns, and allows customers to book stays at Horseshoe Baltimore online, and regularly publishes press releases regarding activities and other news at its Horseshoe Baltimore property. (Ex. 6).

9.  Here the ownership of Horseshoe Baltimore Casino by Caesars Entertainment Corporation, its subsidiaries, and affiliated entities is confirmed by court documents, filings with the Securities and Exchange Commission. Furthermore, Caesars Entertainment Corporation has created, through its own public statements, the veil of apparent agency, under which theory it is liable for its publications and also to damages in Maryland. See, *Chevron USA v. Lesch*, 319 Md. 25, 34-35 (1990) ("apparent authority results from certain acts and manifestations by the alleged principal to a third party leading the third party to believe that an agent had authority to act.").

## Caesars Entertainment, Inc.

10. Caesars Entertainment, Inc. (previously Eldorado Resorts, Inc. and Caesars Entertainment Corporation) is a Nevada Corporation that acquired Caesars Entertainment Corporation, the prior owner of Horseshoe Casino Baltimore.[3]

11. At all times pertinent to this complaint the security and management personnel involved in the occurrence were acting within the course and scope of their

---

[2] According to Caesars, ownership of Horseshoe by Caesars Entertainment Operating Company was transferred to Caesars Growth Properties in exchange for $460 millions in cash in October 2013, which it refers to as the "Growth Transaction". (Ex. 1).
[3] <https://www.bloomberg.com/news/articles/2020-07-20/eldorado-completes-caesars-deal-becoming-new-casino-powerhouse>

7

employment with the Defendant Corporations.

12. The acts and omissions undertaken by Corporate Defendants and their employees as set forth in this complaint were undertaken with actual malice, evil intent, willfulness, a reckless disregard for Liverpool's rights, and with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure Liverpool arbitrarily such that it shocks the conscience; and alternatively as pled with negligence and gross-negligence in other counts.

## JURISDICTION AND VENUE

13. This Court has personal jurisdiction over the Defendants as they committed tortious against Liverpool in Baltimore City, and the Corporate Defendants operate and have sufficient contacts in Baltimore City, Maryland to warrant jurisdiction in Maryland and Venue in this Court.

14. This Court has jurisdiction under Title 4 of the Courts and Judicial Proceedings Article of the Annotated Code of Maryland.

15. Venue is appropriate under Title 6 of the Courts and Judicial Proceedings Article of the Annotated Code of Maryland.

## FACTS COMMON TO ALL COUNTS

16. Liverpool was a regular business invitee at the Horseshoe Casino Baltimore and was a Seven Star member which according to Caesars' website is "the pinnacle tier of

8

the Caesars Rewards loyalty program".[4]

17.  On or about April 22, 2018, at approximately 4:30am, Liverpool was at the Horseshoe Casino Baltimore, playing craps with his friend Patton.

18.  While Liverpool and his friend were playing, a man tells Liverpool "why you talking to my wife."

19.  This man then proceeded to tell Liverpool "imma go and get my gun and shoot you".

20.  As this man left, Casino personnel approached Plaintiff and told him "the casino wants you to leave for 24 hours."

21.  Liverpool requested a floor supervisor for his safety and as an invitee.

22.  Several security guards instead approached Liverpool in a menacing way, in response to his request to speak with a supervisor.

23.  Liverpool explained to the security guards that he was simply there playing craps with a friend, and was not causing any trouble, and informed them about the man who had threatened to get a gun, and had left the casino floor, allegedly to retrieve his firearm.

24.  Liverpool told the security personnel that he was being placed in danger by being ordered out of the casino with that death threat because he would end up walking in the same direction as the man retrieving a gun to shoot him.

---

[4] <https://www.caesars.com/myrewards/sevenstars>

9

-Law Offices of Abraham F. Carpio-
3311 Toledo Terrace, Suite B 201
Hyattsville, MD 20782 * (301)-559-8100

25. Liverpool explained to the security personnel that he had requested a supervisor for the purpose of clarifying the threat to his life and that he wanted to have the police called because the other man clearly was enraged and promised to kill him.

26. The security personnel ignored the gun threat made against Liverpool, with a callous disregard for the threat to Liverpool's life as well as the safety of everyone present at the casino.

27. A security guard then forcibly grabbed Liverpool's right arm without his consent or permission, and Liverpool pushed the guards hand off of his arm and said, "don't touch me" as it was his righ to do so, after being assaulted without cause.

28. Multiple security personnel then sprinted towards and attacked Liverpool and forced him onto the floor.

29. Horseshoe Casino Baltimore security personnel then allegedly proceeded to use illegal, excessive and disproportionate deadly force against Liverpool, without legal justification or excuse.

30. They did so when Defendant Security Guards placed Liverpool in a prone position with one hand behind his back and allegedly began to mechanically asphyxiate Liverpool.

31. John Doe Security Guard 1 allegedly pressed down with his weight, kneeling on Liverpool's back, thereby compressing Liverpool's lungs and inhibiting his respiratory movements.

10

-Law Offices of Abraham F. Carpio-
3311 Toledo Terrace, Suite B 201
Hyattsville, MD 20782 * (301)-559-8100

32. John Doe Security Guard 2 allegedly simultaneously pressed his knee down, crushing Liverpool's head.

33. Other Horseshoe Casino security guards allegedly joined in to pile on top of Liverpool, with some of the security guards pressing down Liverpool's arms while other's got onto Liverpool's legs.

34. Liverpool felt helpless as he was crushed under the overwhelming weight of multiple casino employees.

35. Liverpool told the security guards "I can't breathe" and they responded by saying "you can breathe cause your talking". The more Liverpool told the casino personnel that he can't breathe, the more they appeared to ignore him.

36. Liverpool felt like he was overheating and became increasingly lightheaded as he struggled to get oxygen.

37. Liverpool wondered if he was taking his last breath and experienced intense fear and panic as he became convinced that he was going to die.

38. Defendant Security Guards continued to compress Liverpool's lungs and his head for what felt like minutes and caused Liverpool to suffer traumatic asphyxiation.

39. The security personnel handcuffed Liverpool and eventually stood him up, then forcibly escorted Liverpool in handcuffs across the casino floor, thereby directly and proximately placing Liverpool in a false light by falsely holding him out to be a criminal or wrongdoer to the public.

40. The security guards took Liverpool through the poker room to a holding room

11

and locked him inside against his will.

41. The casino personnel left Liverpool on a chair with his hands cuffed behind his back.

42. While Liverpool was detained in the casino's holding room, Defendant John Doe Supervisor approached him and told Liverpool that Horseshoe Casino Baltimore had already been investigating him because of the money he had been coming in with. Liverpool believes and therefore avers that the comment was racist and implied that a black man cannot make money legitimately. Liverpool furthermore avers that the manner in which the casino personnel treated him throughout the occurrence was motivated by a race-based invidiously discriminatory animus.

43. Defendant John Doe Supervisor oversaw and approved all of the criminal and tortious actions of the security personnel described herein.

44. Once the casino personnel placed Liverpool in the room, they shut the door leading back into the casino, and around four security guards surrounded Liverpool, and positioned themselves to block the exists to prevent Liverpool from being able to leave the room.

45. Liverpool was cognizant and aware of his confinement and was harmed by the wrongful deprivation of his liberty.

46. The casino security guards searched Liverpool's body, pockets, took out his wallet and State Issued Identification Card.

47. Two Baltimore Police officers arrived and ran Liverpool's license. The police

12

allegedly made the determination that there was no evidence that Liverpool had

committed any crime and then told casino personnel "we're not going to deal with

this" and left.

48. The security personnel gave Liverpool a permanent eviction letter, notifying

him that he was permanently banned from Horseshoe Casino Baltimore and all other

Caesars properties.

49. Doctor Diadema Simon-Beltran, M.D. conducted a physical examination of

Liverpool on April 23, 2018 and diagnosed Liverpool with the following injuries

resulting from the physical attack by Horseshoe Baltimore Casino personnel (1)

sprain/strain of the cervical spine and left trapezius. (2) Contusion/strain of the left

shoulder joint. (3) Contusion/strain of the left elbow joint. (4) Contusion/strain of

the lumbar spine. (5) Contusion/strain of the right wrist joint.

50. Liverpool underwent physical therapy to treat his injuries and incurred

thousands of dollars in medical expenses, as well as severe pain and suffering.

51. Dr. Simon-Beltran determined "to a reasonable degree of medical certainty that

the initial presenting complaints are causally related to the injuries that [Liverpool]

sustained on April 22, 2018."

52. When the murder of George Floyd[5] was published online, Liverpool viewed

---

[5] The killing of George Floyd in Minneapolis by police, was captured on video and caused widespread protest across the country against systemic problems with a system problem of racism and abuse perpetrated by police officers across the country. *United States. Estate of Jones*

13

-Law Offices of Abraham F. Carpio-
3311 Toledo Terrace, Suite B 201
Hyattsville, MD 20782 * (301)-559-8100

the video of a police officer pressing his knee down on George Floyd's neck and caused Liverpool to experience flashbacks to being held down by Horseshoe Casino security guards.

53. At all times relevant hereto, the personnel and security guards acted under the express or implied authorization of defendant companies as employees and/or agents of the defendant business entities.

54. As employers of the security guards and other personnel involved, the Corporate Defendants are liable for the torts committed by their employees through the doctrine of Respondeat Superior, as well as joint and several liablity.

## COUNT I
## BATTERY

55. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows[6]:

56. Defendants' security personnel allegedly committed a battery by conducting violent physical attack against Liverpool, thus putting Liverpool's life endanger by committing and offensive contact against Liverpool against his will and without his consent or legal justification; by among other things, allegedly pressing down on Liverpool's back thus causing him to struggle to breath.

---

*v. City of Martinsburg*, No. 18-2142, 2020 U.S. App. LEXIS 18136, at *25 (4th Cir. June 9, 2020).

[6] Liverpool, as of this writing, has been denied access by Horseshoe to inspect the video recording of this incident. Therefore, Liverpool may amend this complaint in due course after the video is released in discovery.

14

57. Here multiple batteries were allegedly committed by Defendants' security guards against Liverpool, multiple times, including but not limited to: (1) when a security grabbed Liverpool's arm (2) by grabbing Liverpool and knocking him onto the ground (3) when John Doe Security Guard 2 pressed their knee down on Liverpool's head while John Doe Security Guard 1 applied his body weight to Liverpool's back thereby inhibiting the respiratory ability and movement of Liverpool's lungs, and mechanically asphyxiating Liverpool (4) when other casino security personnel joined in to pile on top of Liverpool to further aggravate the pressure and weight on crushing down on Liverpool's body, (5) the placement of the handcuffs on Liverpool's arms during the security guards' commission of a false arrest against Liverpool, and (6) forcible asportation of Liverpool against his will to the casino holding room for confinement.

58. A medical professional evaluated Liverpool and determined that the multimple batteries and attack committed by the security personnel employed by Defendants caused physical injuries to Liverpool's cervical spine and left trapezius, left shoulder joint, left elbow joint, lumbar spine and wrist joint.

59. At no time did Liverpool consent to this intentional, offensive, unlawful, and harmful touching. Furthermore, at no time did the Liverpool pose a threat to Defendants or anyone in the casino, nor did Liverpool use force himself to warrant Defendants committing battery against him.

60. At no time did Liverpool receive an oral or written justification for the

15

Defendant's tortious misconduct toward him, an invittee; nor did Liverpool provoque or justify any of his battery by Defendants.

61. Liverpool suffered injury, both mental and physical, and incurred medical expenses directly and proximately caused by the battery. Here, the emotional distress Liverpool suffered was severe because casino personnel placed Liverpool in respiratory distress, and he believed he was going to die.

62. Liverpool experienced intense fear and panic as the Defendant Security Guards mechanically and methodically asphyxiated him, and therefore has sufficient pain and suffering amounting to a claim for damages against all Corporate Defendants and their agents, jointly and severally.

63. As a proximate and direct result of Defendants' aforementioned conduct, Liverpool has suffered and will continue to suffer damages including, but not limited to economic, non-economic and compensatory damages, punitive damages, expenses and attorneys' fees more fully set out below, against all defendants jointly and severally.

## COUNT II
## FALSE IMPRISONMENT

64. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

65. Horseshoe Casino Baltimore security personnel unjustifiably and illegally physically seized Liverpool without his consent and without legal justification through

16

grabbing (manipulation), asportation of his body, body and property search, and confinement of his person against his will.

66. The Corporate Defendants' security personnel forced Liverpool onto the floor and physically held his body on the floor with the demonstrable intent to apprehend and falsely imprison Liverpool. (Pl's Cmpl. ¶¶ 20-27).

67. The security guards placed handcuffs on Liverpool and took him by force and against his will to a holding room away from the casino floor with the demonstrable intent to falsely imprison Liverpool. (Id. ¶ 28).

68. Defendants' security guards closed the room doors (the only available exits) to the location where they took Liverpool, and also positioned themselves in front of the exits to block any reasonable means of exit to prevent and confine Liverpool against his will; thus evincing their demonstrable intent to falsely imprison Liverpool. (Id. ¶¶ 29, 33).

69. Once secured against his will in a confined room with no escape, the casino personnel left Liverpool on a chair with his hands cuffed behind his back. (Id. ¶ 30).

70. The actions of the security guards caused Liverpool to be unlawfully deprived of his liberty, and demonstrate he was falsely imprisoned against his will and without his consent.

71. Liverpool was detained against his will by Defendants for at least 15 minutes, which detainment proximately caused him mental anguish, embarrassment, anxiety, suffering and an illegal deprivation of his liberty, warranting damages.

-Law Offices of Abraham F. Carpio-
3311 Toledo Terrace, Suite B 201
Hyattsville, MD 20782 * (301)-559-8100

72. Liverpool had not committed any crime nor was engaged in illegal activity to warrant his false imprisonment or detention, and therefore said detention was done with malice aforethought and/or reckless indifference to his rights, and/or negligently.

73. Moreover, Baltimore City Police Department officers arrived and allegedly determined that Liverpool had not committed any crime to warrant his detention, and accordingly chose to take no action on scene. (Id. ¶ 36).

74. Defendants' security guards demonstrated by their conduct and actions that they intentionally deprived Liverpool of his personal liberty without consent and legal justification, and thus falsely imprisoned Liverpool and proximately caused him damages.

75. Liverpool was conscious during his confinement and was proximately harmed by the confinement and endured pain and suffering as a direct result. (Id. ¶ 34).

76. As a proximate and direct result of Defendants' aforementioned conduct, Liverpool has suffered and will continue to suffer damages including, but not limited to economic, non-economic and compensatory damages, punitive damages, expenses and attorneys' fees more fully set out below, against all defendants jointly and severally.

18

## COUNT III
## FALSE ARREST

77. Liverpool incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

78. Liverpool did not commit a felony nor a misdemeanor amounting to breach of the peace, thus there was no legal justification for a citizen's arrest of Liverpool by casino employees.

79. Liverpool was deprived of his liberty by the employees of the Corporate Defendants when they blocked his egress, held him down on the floor, handcuffed him, and perp walked him against his will to a holding room where they confined him in a holding room without Liverpool's consent.

80. Liverpool had not committed any crime nor was engaged in illegal activity to warrant his egress being blocked, handcuffed/physically restrained against his will and arrested by the Corporate Defendants' security personnel.

81. As a proximate and direct result of Defendants' aforementioned conduct, Liverpool has suffered and will continue to suffer damages including, but not limited to economic, non-economic and compensatory damages, punitive damages, expenses and attorneys' fees more fully set out below, against all defendants jointly and severally.

-Law Offices of Abraham F. Carpio-
3311 Toledo Terrace, Suite B 201
Hyattsville, MD 20782 * (301)-559-8100

## COUNT IV
## NEGLIGENCE

82. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows.

83. Liverpool was a business invitee at Horseshoe Casino Baltimore, a business of Caesar Entertainment, Inc. its subsidiaries and affiliated entities. Thus, Defendants owed Liverpool a duty to use reasonable care to see that those portions of the property that he may be expected to use are safe, including the conduct of their trained staff therein toward him.

84. John Doe Security Guard Defendants 1 and 2 acted also negligently in illegally detaining and using excessive force upon Liverpool to detain him in a public area without reasonable suspicion or probable cause.

85. The Corporate Defendants have a duty of care to train and supervise their employees such as their security personnel, and should know how to treat patrons like Liverpool with due care while on their premises.

86. Defendants breached this standard of care for an establishment like Horseshoe and its corporate parents, by directing, allowing or even permitting its staff to physically batter, restrain, manhandle or attack patrons and detain them against their will; especially when the patron has not committed a crime or done anything wrong.

87. Furthermore, the Corporate Defendants have a duty to train and supervise their security personnel as to when an individual may be detained, and when physical

-Law Offices of Abraham F. Carpio-
3311 Toledo Terrace, Suite B 201
Hyattsville, MD 20782 * (301)-559-8100

force may be used to protect the invitee, other guests or the property.

88. The Corporate Defendants also have a duty to instruct their security personnel on conduct that is not permissible and is even a criminal offense, including using their body weight to asphyxiate patrons and place them at risk of death.

89. In this case, Liverpool was playing a game of craps on the casino floor and thus owed a duty of conform to the highest standard of care of patrons by the Defendants. In fact, Liverpool was a well-known casino VIP as a member of its highest tiered group of Seven Star players and therefore was owed this duty of care. (Pl's. Cmpl. ¶ 8).

90. Liverpool, when he found himself under the threat of murder from another patron who had allegedly gone to his car to retrieve a gun (Id. ¶ 11), asked for assistance from Defendants and their protection given the standard of care of a special relationship created by Horseshoe and the Defendants, for the benefit of all patrons.

91. But instead, far from making the premises safe for Liverpool, the Defendants disregarded their duty to secure their premises from this threat of gun violence, ignoring the gun threat altogether and by asking Liverpool to expose himself to the danger outside the casino[7]. (Id. ¶ 15-18).

---

[7] The court will take judicial notice that Baltimore City has a high homicide rate, as well as a high rate of gun violence within its city limits. The journalistic reports of this high crime rate phenomenon are well documented, as well as in the annals of this Court's cases. Liverpool was well aware of this grave danger when he requested help from the Casino security.

-Law Offices of Abraham F. Carpio-
3311 Toledo Terrace, Suite B 201
Hyattsville, MD 20782 * (301)-559-8100

92. While the deranged individual allegedly went to retrieve a gun to open fire inside of the casino against Liverpool, the Corporate Defendants' security personnel pummeled Liverpool onto the ground and began asphyxiating him thereby placing Liverpool in an imminent risk of death and causing Liverpool physical injuries and severe emotional distress. (Id. ¶¶ 19-27, 37, 39).

93. Liverpool's head and lungs were being compressed by the John Doe Defendant Security Guards 1 and 2, he suffered intense fear and panic, as he struggled to breathe and believed he was going to die.

94. The battery committed against Liverpool by the security personnel of the Corporate Defendants were the actual and proximate cause of Liverpool's physical injuries and severe mental distress.

95. The Corporate Defendants' failure to properly train and supervise their security personnel also caused Liverpool to be seized, illegally searched, and falsely imprisoned by Horseshoe Casino Baltimore personnel. (Id. ¶¶ 28-35).

96. Defendant John Doe Supervisor oversaw the battery and false imprisonment perpetrated by Corporate Defendants' security personnel. He not only permitted the violent attack and subsequent kidnapping of Liverpool, but also assisted as a tacit collaborated, and allegedly made racist comments to Liverpool while he was unlawfully confined in the casino's holding room. (Id. ¶ 31).

97. Here the Corporate Defendants and the Defendant John Doe Supervisor, negligently supervised the security personnel committing the criminal acts and

-Law Offices of Abraham F. Carpio-
3311 Toledo Terrace, Suite B 201
Hyattsville, MD 20782 * (301)-559-8100

intentional torts against Liverpool described herein.

98. The Corporate Defendants and Supervisor actively oversaw and permitted the violent attack as part of a pattern by the Corporate Defendants to allow their security personnel to abuse, physically attack, and unlawfully detain Liverpool with impunity.

99. The Corporate Defendants and John Doe Supervisor's breached their duty of care to Liverpool as an invitee, and after having a special relationship with Liverpool, which was the actual and proximate cause of his injuries.

100. Liverpool's physical injuries, loss of liberty, mental anguish, mortification, physical injury, loss of sleep, and outrage, are a reasonably foreseeable result of Defendants' breach of their duty to use reasonable care to see that those portions of the property that Liverpool may have been expected to use were safe and to properly train and supervise their security personnel, as well as a breach of the special relationship created with Liverpool as a patron in need of assistance.

101. As a proximate and direct result of Defendants' aforementioned conduct, Liverpool has suffered and will continue to suffer damages including, but not limited to economic, non-economic and compensatory damages, punitive damages, expenses and attorneys' fees more fully set out below, against all defendants jointly and severally.

-Law Offices of Abraham F. Carpio-
3311 Toledo Terrace, Suite B 201
Hyattsville, MD 20782 * (301)-559-8100

## COUNT V
## GROSS NEGLIGENCE

102. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows.

103. The Corporate Defendants' security personnel intentionally failed to (1) perform their duty of securing the casino complex from an active shooter threat; (2) to conduct themselves towards Dominque Liverpool in a manner that was safe to Liverpool and (3) breached their obligation to maintain a premises that is safe for patrons including safety from a violent and life-threatening physical attack, kidnapping, and false imprisonment by Horseshoe Casino Baltimore personnel.

104. The casino security guards acted recklessly, wantonly and willfully, to inflict physically injury and severe mental distress to Liverpool. Defendant John Doe Security Guards 1 and 2 caused Liverpool to be traumatically asphyxiated by compressing his head and lungs with their body weight. Horseshoe Casino Personnel had no legal justification or privilege to even touch Liverpool because Liverpool had not done anything wrong or illegal.

105. The security guards of Horseshoe Casino were so utterly indifferent to the threat posed to Liverpool's life and to everyone in the casino complex, by a deranged third party that was allegedly retrieving a firearm.

Then, rather than protect Liverpool when he requested help based on the special relationship with casino security, the Defendants intentionally inflicted bodily harm to

24

Liverpool, and intentionally caused Liverpool fear of imminent death by impairing Liverpool's ability to breath while simultaneously pressing a knee down crushing his head.

106. Defendants unlawfully deprived Liverpool of his liberty against his will by physically restraining him, handcuffing him, kidnapping him, and confining him in the casino holding room.

107. Defendants intentionally failed to perform a manifest duty in reckless disregard of the consequences affecting Liverpool's life.

108. Defendants' acted with a thoughtless disregard of the consequences without the exertion of any effort to avoid causing Liverpool's injuries.

109. Defendants' security personnel acted wantonly and willfully, to intentionally inflict Liverpool's injuries.

110. Defendants' security guards attacked, falsely arrested and falsely imprisoned Liverpool with such an utter indifference to Liverpool's fundamental right to bodily integrity and freedom from bodily restraint, such that they acted as if Liverpool's rights did not exist.

111. The Corporate Defendants, John Doe Supervisor, and other members of management at Horseshoe Casino Baltimore did nothing to address the violent criminal actions against Liverpool carried out by casino security personnel during or even after the occurrence.

112. Defendant Corporations' and Supervisor's indifference, actual malice, and

-Law Offices of Abraham F. Carpio-
3311 Toledo Terrace, Suite B 201
Hyattsville, MD 20782 * (301)-559-8100

their reckless response to the murder threat against Liverpool as well as their intentional failure to intervene to end the criminal attack and detention against Liverpool carried out by their security personnel arises out of a deeply ingrained custom, pattern, and practice of misconduct, patron abuse by the Corporate Defendants.

113. Defendants acts and omissions are the actual and proximate cause of Liverpool's physical injuries, unlawful deprivation of liberty, outrage, panic, fear, severe emotional distress, mortification, hedonic damages, and mental anguish.

114. As a result of the Defendants' conduct, Liverpool has suffered and will continue to suffer mental anguish, emotional distress, mortification, outrage, medical and related expenses, physical impairment, and other injury.

115. As a proximate and direct result of Defendants' aforementioned conduct, Liverpool has suffered and will continue to suffer damages including, but not limited to economic, non-economic and compensatory damages, punitive damages, expenses and attorneys' fees more fully set out below, against all defendants jointly and severally.

## COUNT VI
## NEGLIGENT HIRING AND RETENTION

116. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows.

117. Defendants had a duty to ensure their staff were hired, trained and comported

26

with highest standard of care for Liverpool as a business invitee, who was at their casino playing a table game at their invitation.

118. Defendants owed a duty to Liverpool to use due and reasonable care in selecting, hiring, training and retaining their employees.

119. Defendants failed to provide this care and thus proximately caused damages to Liverpool.

120. Defendants knew or should have known through a reasonable investigation that the security guards they hired were potentially dangerous and capable of causing harm to others, and/or failed to adequately train, monitor or retain the same after hiring based on said employee's misconduct herein.

121. Plaintiff believes and therefore avers that Defendants came to have information after hiring the security guards involved in Liverpool's beating and false imprisonment, and did not act on that information, and instead negligently retained these personnel.

122. The Corporate Defendants knew or should have known that John Doe Security Guards 1 and 2 had an alleged history of violence, or a disposition towards using dangerous combat techniques upon patrons such as the asphyxiation technique; and if not, then failed to train said employees not to use said methods upon patrons.

123. The Corporate Defendants' breach of that duty actually and proximately caused Liverpool's traumatic asphyxiation and resulting physical injuries and severe emotional distress.

27

124. Defendants' negligent hiring, training and retention actually and proximately caused Liverpool's injuries.

125. As a proximate and direct result of Defendants' aforementioned conduct, Liverpool has suffered and will continue to suffer damages including, but not limited to economic, non-economic and compensatory damages, punitive damages, expenses and attorneys' fees more fully set out below, against all defendants jointly and severally.

## COUNT VII
## FALSE LIGHT

126. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows.

127. Defendants' security guards battered, assaulted, and falsely imprisoned and arrested Liverpool on the floor of the casino in wide open and public view. By publicly causing Liverpool to be handcuffed, and then perp walking Liverpool through the casino in front of other patrons' clear view in an open and notorious fashion, Defendants wrongfully held out Liverpool to be a person of bad character, a criminal or wrongdoer deserving of such open maltreatment.

128. Defendants' false showcasing and presentation of Liverpool as a malfesor, criminal or wrongdoer in this manner would be highly offensive to a reasonable person, and especially to Liverpool.

28

129. The characterization of Liverpool as a malfesor or criminal would be objectively objectionable to the ordinary person under the circumstances, including Liverpool.

130. Defendants had actual or imputed knowledge of or acted in reckless disregard as to the falsity of the publicized handling of Liverpool through its casino floor, and the false light in which Liverpool would be placed.

131. Liverpool had not committed any illegal act and therefore the actions by the Defendants' security personnel directly and proximately placed Liverpool in a false light and caused damages to his reputation.

132. As a proximate and direct result of Defendants' aforementioned conduct, Liverpool has suffered and will continue to suffer damages including, but not limited to economic, non-economic and compensatory damages, punitive damages, expenses and attorneys' fees more fully set out below, against all defendants jointly and severally.

## COUNT VIII
## CONVERSION

133. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows.

134. Horseshoe Casino Baltimore security personnel searched Liverpool's body and pockets and proceeded to unlawfully and illegally seize Liverpool's wallet and ID, without legal justification or excuse. (Pl's Compl. ¶ 35).

-Law Offices of Abraham F. Carpio-
3311 Toledo Terrace, Suite B 201
Hyattsville, MD 20782 * (301)-559-8100

135. The Corporate Defendants security personnel exercised dominion over Liverpool's personal property by taking Liverpool's wallet and identification card without Liverpool's consent, thereby wrongfully depriving Liverpool of his property to which he was entitled.

136. The conversion of Liverpool's wallet and identification document occurred the moment casino security employees took this property from Liverpool's pockets without Liverpool's consent.

137. Here, Defendants conversion of Liverpool's property and the other intentional torts they perpetrated against Liverpool were undertaken wantonly with a reckless disregard for Liverpool's rights and callous disregard for Liverpool's life, with ill will, oppressiveness, without legal justification or excuse, and with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure Liverpool.

138. As a proximate and direct result of Defendants' aforementioned conduct, Liverpool has suffered and will continue to suffer damages including, but not limited to economic, non-economic and compensatory damages, punitive damages, expenses and attorneys' fees more fully set out below, against all defendants jointly and severally.

30

## RELIEF SOUGHT

139. Wherefore, Plaintiff demands a jury trial on all counts, and upon a verdict in his favor, asks that economic, non-economic and compensatory damages in the amount of two million five-hundred thousand dollars ($2,500,000) be awarded to him against all defendants jointly and severally.

140. Plaintiff also demands and sues all Defendants and seeks punitive damages of five million dollars ($5,000,000) be assessed against the Defendants, for those claims for which they are available by law, jointly and severally.

141. Plaintiff also seeks to be awarded costs, attorneys' fees, and all other relief to which he is entitled under State law for all his claims.

142. Plaintiff also seeks leave of Court to freely amend this complaint in due course and to add co-Defendants upon proper cause and justification.

## AFFIRMATION

I affirm the foregoing to correct and true to the best of my information, knowledge, and belief.

Dominique Liverpool

Respectfully submitted,

Abraham Fernando Carpio, LLC
3311 Toledo Terrace, Suite B-201
Hyattsville, MD 20782
*Counsel for Dominique Liverpool*

31

-Law Offices of Abraham F. Carpio-
3311 Toledo Terrace, Suite B 201
Hyattsville, MD 20782 * (301)-559-8100

# EXHIBIT 1

# EXHIBIT 1

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

# FORM T-3

---

## FOR APPLICATIONS FOR QUALIFICATION OF INDENTURES
## UNDER THE TRUST INDENTURE ACT OF 1939

---

# CAESARS ENTERTAINMENT OPERATING COMPANY, INC.
### (Name of Applicant)*

---

**One Caesars Palace Drive**
**Las Vegas, Nevada 89109**
(Address of Principal Executive Offices)

**Securities to be Issued Under the Indenture to be Qualified**

---

| Title of Class | Amount |
| --- | --- |
| First-Priority Senior Secured Floating Rate Notes Due 2023 | $306,000,000 |

### Approximate date of proposed public offering:

On, or as soon as practicable following, the effective date (the "*Effective Date*") under the Second Amended Joint Plan of Reorganization of Caesars Entertainment Operating Company, Inc., et al. pursuant to Chapter 11 of the Bankruptcy Code (as amended or supplemented, the "*Plan of Reorganization*").

---

**John Payne**
**Chief Executive Officer**
**Caesars Entertainment Operating Company, Inc.**
**One Caesars Palace Drive**
**Las Vegas, Nevada 89109**
(Name and Address of Agent for Service)

---

As discussed below, since its formation CGP has purchased several properties and a portion of their associated management fees from CEOC.

### 4.    Caesars Enterprise Services, LLC

CES (sometimes referred to as "ServicesCo") is a joint venture among CEOC, CERP, and Caesars Growth Properties Holdings, LLC ("CGPH"), an indirect subsidiary of CGP and holding company for the CGP subsidiaries that own Planet Hollywood Resort and Casino, The Cromwell, Horseshoe Baltimore, The LINQ Hotel & Casino in Las Vegas, Bally's Las Vegas, and Harrah's New Orleans. Historically, CEOC and its employees managed and funded centralized corporate functions—such as legal, accounting, payroll, information technology, and other enterprise-wide services—for all Caesars properties. As the company expanded since 2008, including with the formation of CAC and CGP (which did not exist when the initial centralized service structure was put in place), CES was formed in 2014, according to CEC, as a centralized "Services Company" to (a) manage centralized assets, such as certain intellectual property and the Total Rewards® loyalty program, (b) employ personnel who provide enterprise-wide services to Caesars branded properties, and (c) ensure an equitable allocation of costs around centralized services, including capital expenditures for shared services and the prioritization of projects.

CERP and CGPH contributed the initial funding needs of CES with $42.5 million and $22.5 million in cash, in exchange for which they received 20.2 percent and 10.8 percent ownership of CES, respectively. CEOC owns the remaining 69 percent of CES. Each of CEOC, CERP, and CGPH has equal 33 percent voting control over CES, rather than in accordance with their ownership stakes. CES's management and operations are governed by a steering committee, which consists of one member from each of CEOC, CERP, and CGPH. The steering committee can take action by a majority vote (subject to unanimity requirements for certain material actions) or written consent of the steering committee members.

CES provides the Debtors with substantially all of their corporate, regional, and shared (with CERP, CGPH/CGP, or both) employees, as well as substantially all of their property-level employees at the director level or above. As of the Petition Date, the majority of the approximately 2,000 management-level personnel responsible for running the Debtors' businesses are employed by CES, and CES is responsible for all employment-related obligations associated with these employees, including employment agreements, collective bargaining agreements, and any obligation to bargain and negotiate with a union.

Pursuant to an Omnibus License and Enterprise Services Agreement (the "Omnibus Agreement"), CEOC granted to CES a non-exclusive license to use —but otherwise retained ownership of—certain intellectual property, including Total Rewards®. In turn, CES generally grants to each entity that owns a property a license in and to the intellectual property relevant to such entity's property.

CES is a cost-allocation center and is therefore not designed to make profit; all services provided for CEOC, CERP, and CGP are provided on a profit-neutral basis. The corporate overhead expenses incurred by CES in performing centralized services, employing personnel, and managing intellectual property are allocated among CEOC, CERP, and CGPH, and generally reimbursed on a weekly basis, with a monthly true-up.[24] Allocation percentages are based on a complex allocation methodology that takes into account each entity's consumption of the specified service or cost.

Prior to the formation of CES, the Debtors also historically managed payroll and accounts payable functions for CEOC, CERP, and CGP and their predecessor entities, with periodic reimbursements from CERP and CGP. The formation of CES has shifted these duties from the Debtors to CES, with CES processing all payroll data for the Debtors and their non-Debtor affiliates, and in substantially all cases acting as a third-party administrator in making payments to the Debtors' employees and remitting any appropriate deductions on account of payroll taxes or other withholdings to taxing authorities and other third-party benefit providers. CES provides the same services for CERP and CGP.

---

[24]    From time to time, CES has and may continue to issue capital calls to CEOC, CERP, and CGPH to ensure that CES meets its working capital requirements.

The SGC Investigation concluded that with respect to the CERP Transaction, it is highly likely the Debtors could recover on claims for constructive fraudulent transfer and fraudulent transfer with actual intent against CEC, CERP, and Rio Properties, breach of fiduciary duty against CEOC's directors and CEC, and aiding and abetting breach of fiduciary duty against the Sponsors (particularly Apollo). CEOC was insolvent and the consideration it received did not represent reasonably equivalent value as it was deficient by approximately $444 million. Many badges of fraud also are present, including that CEOC was insolvent; lack of reasonably equivalent value; transfer to an insider; and transfer of strategic, "crown jewel" assets. In addition, the Sponsors stood on both sides of the transaction and attempted to reduce the price paid to CEOC for the Octavius/Linq assets. The Sponsors likewise provided incomplete and/or inaccurate information to Perella, thus diminishing the relevance of its reasonably equivalent value opinion. Further, there was insufficient process and inadequate governance to protect CEOC's interests in the transaction, including no independent directors to evaluate the transaction and negotiate on CEOC's behalf. Finally, the SGC Investigation concluded that CERP is unlikely to obtain the good faith offset under section 548(c) for the approximately $133 million in cash and retired notes that CEOC received as consideration.

### 4. The Growth Transaction

In mid-2012, the Sponsors began evaluating potential structures for a new Caesars entity that would acquire growth assets from CEC and CEOC, including whether the structure would be sufficiently "bankruptcy remote" to protect the assets if CEOC or CEC filed for bankruptcy. That entity became known as CGP, which is now a subsidiary of CAC. In October 2013, CEOC subsidiaries transferred the Planet Hollywood Resort & Casino in Las Vegas, CEOC's interest in the Horseshoe Baltimore project, and 50 percent of the management fees associated with these two properties to CGP in exchange for $360 million in cash and CGP's assumption of $513 million in debt associated with these properties (the "Growth Transaction").

The Growth Transaction was negotiated over several months among representatives of the Sponsors and an independent Valuation Committee of CEC's Board (the "CEC Valuation Committee"), which was formed to determine the fair market value of the assets and equity exchanged in the Growth Transaction. The CEC Valuation Committee engaged Morrison & Foerster LLP ("Morrison & Foerster") as legal counsel and Evercore Partners LLC ("Evercore") as its financial advisor. Evercore opined, among other things, that the consideration CEOC received in exchange for these assets was not less than the fair market value of such assets. The CEC Valuation Committee likewise concluded that the consideration paid for the assets represented fair market value.

The SGC Investigation concluded that with respect to the Growth Transaction, it is highly likely that the Debtors could recover on claims for constructive fraudulent transfer and fraudulent transfer with actual intent against CGP, and breach of fiduciary duty against the CEOC directors and CEC. It is also likely that the Debtors could recover on aiding and abetting breach of fiduciary duty claims against the Sponsors (particularly Apollo). CEOC was insolvent, and the consideration it received did not represent reasonably equivalent value as it was deficient by approximately $271 million to $635 million. Many badges of fraud also are present, including that CEOC was insolvent; lack of reasonably equivalent value; transfer to an insider; CEC and the Sponsors retained access to upside through the transaction; and the desire to move the Growth Transaction assets from the reach of creditors to a "bankruptcy remote" entity. In addition, CEC and the Sponsors did not provide Evercore with updated projections in response to Evercore's repeated requests, which resulted in Evercore valuing the properties for less than they were worth. Finally, CEC's contemporaneous requirement for CEOC to repay over $400 million of the CEC-CEOC intercompany revolver undermines CEC's argument that the Growth Transaction was designed to provide CEOC with much-needed liquidity. Moreover, there was insufficient process and inadequate governance to protect CEOC's interests in the transaction, including no independent directors to evaluate the transaction and negotiate on CEOC's behalf. The SGC Investigation concluded that CGP is likely to obtain the good faith offset under section 548(c) for the $360 million in cash paid to CEOC because, among other reasons, CAC and CGP did not exist until the Growth Transaction closed, and it is unclear whether the Sponsors' primary goal of gaining leverage over CEOC's creditors in the event of a chapter 11 filing could be attributable to CGP under these circumstances.

### 5. The Four Properties Transaction

In May 2014, CEOC transferred to CGP four casino properties (The Quad Resort and Casino (renamed the LINQ Hotel & Casino in July 2014), Bally's Las Vegas, The Cromwell, and Harrah's New Orleans) (collectively, the "Four Properties") and 50 percent of the management fees payable by each casino in exchange for approximately $2.0 billion (the "Four Properties Transaction"). The final purchase price consisted of $1.815 billion of cash and CGP's assumption of a $185 million credit facility used to renovate The Cromwell.

- CIE 2009. In May 2009, a CEOC subsidiary transferred to CIE (a subsidiary of CEC) certain rights in the WSOP trademarks and related intellectual property in exchange for (a) preferred shares in a holding company with a stated value of $15 million and (b) a license to continue using the WSOP trademarks and IP for limited purposes. The Examiner concluded that with respect to the CIE 2009 transaction, the Debtors have a strong constructive fraudulent transfer claim, a weak fraudulent transfer with actual intent claim, and reasonable breach of fiduciary duty and aiding and abetting breach of fiduciary duty claims, but that the fiduciary duty based claims may be barred by the statute of limitations. The Examiner found the value of the consideration CEOC received was $54.2 million to $66.2 million less than the value of the WSOP trademark and other IP CEOC transferred to CIE. The Examiner also found that CIE may not be able to establish that it was a good faith transferee because the transfer was "orchestrated" by Caesars individuals who were acting on all sides of the transaction and who knew or should have known that CEOC was insolvent.

- CIE 2011. In September 2011, a CEOC subsidiary transferred the hosting rights for WSOP live tournaments to CIE for $20.5 million. The Examiner concluded that with respect to the CIE 2011 transaction, the Debtors have a strong constructive fraudulent transfer claim, a weak fraudulent transfer with actual intent claim, and reasonable breach of fiduciary duty and aiding and abetting breach of fiduciary duty claims, but that the fiduciary duty based claims would be barred by the statute of limitations. The Examiner found the value of the tournament rights CEOC transferred to CIE. The Examiner also found that CEOC received was $29.8 million to $35.4 million less than the value of the tournament rights CEOC transferred to CIE. The Examiner also found that CIE may not be able to establish that it was a good faith transferee because CIE's executives (a) orchestrated the transfer; (b) knew that the purchase price was negotiated without anyone negotiating on CEOC's behalf; and (c) participated in artificially reducing the fee that a Las Vegas casino would pay to host WSOP tournaments, which reduced the consideration CEOC received for the hosting rights.

- 2010 Trademark Transfer. In connection with the August 2010 amendment to the CMBS loan agreement, a CEOC subsidiary transferred ownership of property-specific IP (i.e., "Rio," "Paris," and "Flamingo") to the CERP Properties. CEOC did not receive any consideration for the transfer. The Examiner concluded that with respect to the 2010 Trademark Transfer, the Debtors' claims would be barred by the statute of limitations. The Examiner did not assign any value to those claims.

The Examiner further found that, beginning in late 2012, the Sponsors began to implement a strategy intended to strengthen CEC's and the Sponsors' position in a potential restructuring negotiation with CEOC's creditors or in a CEC or CEOC bankruptcy. This led to a series of transactions that closed in late 2013 and early 2014. The Examiner investigated a series of transactions during this time period:

- The Growth Transaction. On October 21, 2013, a CEOC subsidiary transferred to CGP (a) a 100% equity interest in Planet Hollywood; (b) a 52% equity interest in the Horseshoe Baltimore joint venture; and (c) 50% of the management fees associated with each property. In exchange, CEOC received $360 million in cash. The Examiner concluded that with respect to the Growth Transaction, the Debtors have a strong constructive fraudulent transfer claim, a strong fraudulent transfer with actual intent claim, a strong breach of fiduciary duty claim, and a reasonable aiding and abetting breach of fiduciary duty claim. The Examiner found the consideration CEOC received was $437 million to $593 million less than the value of the assets CEOC transferred to CGP. The Examiner also found that it would be difficult to establish that CAC and CGP were not good faith transferees because, among other reasons, the Sponsors' principal goal of gaining leverage over CEOC creditors in the event of a bankruptcy filing should not be attributable to CAC and CGP.

- The CERP Transaction. On October 11, 2013, a CEOC subsidiary transferred the equity of Octavius Tower and Project Linq to CERP. In exchange, CEOC received $80.7 million in cash and $52.9 million in CEOC notes for retirement. CERP also assumed $450 million of debt associated with the Octavius and Linq properties. The Examiner concluded that with respect to the CERP Transaction, the Debtors have a strong constructive fraudulent transfer claim, a strong actual fraudulent transfer claim,

54

# EXHIBIT 2

# EXHIBIT 2



## CAESARS
### ENTERTAINMENT.

April 23, 2013

## Caesars Entertainment to Form New Growth-Oriented Venture

### Apollo Management and TPG Capital to Invest $500 Million; Capital Raise Can Grow to $1.2 Billion

LAS VEGAS, April 23, 2013 /PRNewswire/ -- Caesars Entertainment Corporation ("Caesars") (NASDAQ: CZR) today announced that its Board of Directors has approved the material terms of a strategic transaction intended to improve the company's capital structure and provide support for new projects. As part of the transaction, Caesars will form a new growth-oriented entity, Caesars Growth Partners, LLC ("Growth Partners"), to be owned by Caesars and participating Caesars stockholders. The transaction is intended to provide capital to allow Caesars to continue to fund growth opportunities in a less levered and more flexible vehicle than its existing operating subsidiaries. In addition, the transaction will result in a cash infusion into Caesars Entertainment Operating Company, Inc. ("CEOC") from the sale of certain assets to Growth Partners, while also freeing CEOC from funding future equity contributions required for certain projects under development.

(Logo: http://photos.prnewswire.com/prnh/20120607/LA21221LOGO)

"The transaction is an important step in our ongoing efforts to improve the company's balance sheet and position ourselves to make strategic investments," said Gary W. Loveman, Chairman, President and Chief Executive Officer of Caesars Entertainment. "Caesars Growth Partners and its simple and flexible capital structure provide us with a vehicle to pursue growth opportunities while retaining a significant portion of the financial upside associated with these assets and projects. The transaction enables us to raise equity capital at attractive valuations without diluting stockholders of Caesars and provides Caesars additional cash liquidity without incurring new debt. I am pleased that our Sponsors, TPG and Apollo, have chosen to express their confidence in our current position and future opportunities through their new investment."

The operating assets contributed or sold by Caesars will be held by Growth Partners. Participating Caesars stockholders, including the Sponsors, will own their interests in Growth Partners through Caesars Acquisition Company ("CAC"), a company created to facilitate this transaction.

In connection with the transactions, Caesars intends to distribute subscription rights at no charge to Caesars' stockholders on a pro rata basis. Funds affiliated with Apollo Management, L.P. and TPG Capital L.P. (the "Sponsors") have advised Caesars that they each intend to invest $250 million in CAC, though they have not entered into any agreement to do so. The consummation of the transaction will be contingent on such investment from the Sponsors. The subscription rights will afford each stockholder of Caesars the right to acquire for cash at least the same pro rata ownership interest in CAC as such stockholder holds in Caesars. The subscription rights are expected to be transferable by Caesars stockholders. CAC could receive approximately $1.2 billion if all subscription rights are exercised in full. All stockholders who elect to invest in CAC, including the Sponsors, will do so on the same terms.

CAC will use the proceeds from its sale of shares to acquire all of the voting interests in Growth Partners. Caesars and its subsidiaries will contribute to Growth Partners their shares of Caesars Interactive Entertainment, Inc. and approximately $1.1 billion face value of senior notes issued by CEOC that are held by a subsidiary of Caesars in exchange for non-voting membership interests. Additionally, Growth Partners intends to use proceeds received from CAC to purchase from a Caesars subsidiary the Planet Hollywood Resort & Casino in Las Vegas, Caesars' joint venture interests in a casino under development in Baltimore (Horseshoe Baltimore) and a financial stake in the management fee stream for both of those properties.

Caesars and its affiliated companies will continue to manage Planet Hollywood and Horseshoe Baltimore, allowing these properties to be part of the Total Rewards network and benefit from Caesars' shared services operating model. Caesars and Growth Partners will have the opportunity to work together to develop future projects. Caesars Entertainment's management and development teams will continue to identify and advance new growth opportunities. Caesars will then have the option to pursue these projects itself or decline the project for itself, after which Growth Partners may elect or decline to pursue the project.

The relative ownership percentages of each of CAC and Caesars in Growth Partners will be determined by the amount of cash proceeds received by CAC, and contributed to Growth Partners, upon the sale of its shares to holders of the subscription

rights.  Caesars is expected to own at least 57% of Growth Partners' economic interests at closing, and as much as 77%, depending on the amount of proceeds raised by CAC through its sale of shares, and will receive a call option that allows it to repurchase all of the economic interest and control of the assets in the future, subject to certain limitations. The voting units and non-voting units of Growth Partners will participate ratably in distributions and will be identical economically, other than for certain call and liquidation rights.

The values of the assets to be contributed or sold were evaluated on Caesars' behalf by a valuation committee comprised of three of Caesars' independent directors. The valuation committee received financial advice from Evercore Partners and legal advice from Morrison & Foerster LLP.

Mitch Garber, CEO of Caesars Interactive Entertainment, Inc., will serve as CEO of CAC and continue in his role as CEO of CIE.

The closing of the transactions will be subject to certain conditions, including entry into definitive documentation, the receipt of required approvals from applicable gaming and other regulatory authorities and the receipt of certain bring-down opinions, and there can be no assurance that such conditions will be satisfied.

A registration statement under the Securities Act of 1933 relating to the common shares of CAC has not yet been filed with the Securities and Exchange Commission.  The subscription rights and CAC shares may not be sold nor may offers to buy the subscription rights and CAC shares be accepted prior to the time a registration statement relating to such rights and shares is filed and becomes effective.  This press release shall not constitute an offer to sell or the solicitation of an offer to buy any security and shall not constitute an offer, solicitation or sale in any jurisdiction in which such offering, solicitation or sale would be unlawful.

**About Caesars**

Caesars Entertainment is the world's most diversified casino-entertainment company. Since its beginning in Reno, Nevada, more than 75 years ago, Caesars has grown through development of new resorts, expansions, and acquisitions, and now operates casinos on four continents. The company's resorts operate primarily under the Caesars®, Harrah's®, and Horseshoe® brand names. Caesars also owns the World Series of Poker® and the London Clubs International family of casinos. Caesars Entertainment is focused on building loyalty and value with its guests through a unique combination of great service, excellent products, unsurpassed distribution, operational excellence, and technology leadership. Caesars Entertainment is committed to environmental sustainability and energy conservation and recognizes the importance of being a responsible steward of the environment. For more information, please visit www.caesars.com.

This release contains or may contain "forward-looking statements" intended to qualify for the safe harbor from liability established by the Private Securities Litigation Reform Act of 1995. These statements can be identified by the fact that they do not relate strictly to historical or current facts. The Company has based these forward-looking statements on its current expectations about future events. Further, statements that include words such as "may," "will," "project," "might," "expect," "believe," "anticipate," "intend," "could," "would," "estimate," "continue," or "pursue," or the negative of these words or other words or expressions of similar meaning may identify forward-looking statements. These forward-looking statements are found at various places throughout this release. These forward-looking statements, including, without limitation, those relating to future actions, new projects, strategies, future performance, the outcome of contingencies such as legal proceedings, and future financial results, wherever they occur in this release, are necessarily estimates reflecting the best judgment of the Company's management and involve a number of risks and uncertainties that could cause actual results to differ materially from those suggested by the forward-looking statements. These forward-looking statements should, therefore, be considered in light of various important factors set forth above and from time to time in the Company's filings with the Securities and Exchange Commission.

In addition to the risk factors set forth above, important factors that could cause actual results to differ materially from estimates or projections contained in the forward-looking statements include without limitation:

- the ability to satisfy the conditions to the closing of the strategic transaction, including receipt of required regulatory approvals;
- the strategic transaction may not consummate on the terms contemplated or at all;
- the impact of the Company's substantial indebtedness;
- the effects of local and national economic, credit, and capital market conditions on the economy, in general, and on the gaming industry, in particular;
- access to available and reasonable financing on a timely basis;
- the ability of the Company's customer-tracking, customer loyalty, and yield-management programs to continue to increase customer loyalty and same-store or hotel sales;
- changes in laws, including increased tax rates, smoking bans, regulations or accounting standards, third-party relations and approvals, and decisions, disciplines, and fines of courts, regulators, and governmental bodies;
- the ability to recoup costs of capital investments through higher revenues;

- the ability to timely and cost-effectively integrate companies that the Company acquires into its operations;
- the effects of competition, including locations of competitors, competition for new licenses and operating and market competition;
- the potential difficulties in employee retention and recruitment as a result of the Company's substantial indebtedness or any other factor;
- construction factors, including delays, increased costs of labor and materials, availability of labor and materials, zoning issues, environmental restrictions, soil and water conditions, weather and other hazards, site access matters, and building permit issues;
- litigation outcomes and judicial and governmental body actions, including gaming legislative action, referenda, regulatory disciplinary actions, and fines and taxation;
- the effects of environmental and structural building conditions relating to the Company's properties or development projects;
- acts of war or terrorist incidents, severe weather conditions, uprisings, or natural disasters;
- losses sustained as a result of natural disasters, including losses in revenues and damage to property, and the impact of severe weather conditions on the Company's ability to attract customers to certain of its facilities, such as the amount of losses and disruption to the Company as a result of Hurricane Sandy in late October 2012; and
- the impact, if any, of unfunded pension benefits under multi-employer pension plans.

You are cautioned to not place undue reliance on these forward-looking statements, which speak only as of the date of this release. The Company undertakes no obligation to publicly update or release any revisions to these forward-looking statements to reflect events or circumstances after the date of this release or to reflect the occurrence of unanticipated events, except as required by law.

SOURCE Caesars Entertainment Corporation

News Provided by Acquire Media

# EXHIBIT 3

# EXHIBIT 3



# CAESARS
## ENTERTAINMENT.

August 26, 2014

## Horseshoe Casino Baltimore Opens Tonight

### City-integrated casino set to serve as region's premier gaming destination

BALTIMORE, Aug. 26, 2014 /PRNewswire/ -- Horseshoe Casino Baltimore officially welcomes its first guests tonight when the casino opens its doors to the public at 9 p.m. The dynamic gaming entertainment complex pairs the best of Las Vegas-style gaming with unique amenities and local influences to create a casino experience that is unique to Charm City.



Controlled by Caesars Growth Partners, LLC, a joint venture between Caesars Acquisition Company (NASDAQ: CACQ), and Caesars Entertainment Corporation (NASDAQ: CZR), Horseshoe Casino Baltimore is designed to extend the city's tourism district south from the famed Inner Harbor and neighboring sports venues M&T Bank Stadium and Oriole Park at Camden Yards. The casino development is fully integrated within the surrounding area and will maximize connectivity with existing hospitality operators as well as other cultural and nightlife attractions. The casino site was selected by the State and the City to foster economic growth and create new jobs while expanding Baltimore's diverse entertainment offerings.

Horseshoe Casino Baltimore will benefit from the wealth of experience in gaming, entertainment and urban renewal brought by Caesars Entertainment, the manager of the property, as well as Rock Gaming LLC, a major partner in the project. Specializing in the creation of city-integrated casino developments, this project marks the fourth venture between the partners following the openings of Horseshoe Casino Cleveland (2012), Horseshoe Casino Cincinnati (2013) and ThistleDown Racino (2013).

"Horseshoe Casino Baltimore is well-positioned to serve the approximately one million members of our Total Rewards loyalty program who live in the Baltimore-Washington metropolitan area and introduce the Horseshoe brand to new guests," said Gary Loveman, chairman, chief executive officer and president of Caesars Entertainment.

"We are proud to open a gaming-entertainment resort that embodies the city-integrated concept, which complements features of the surrounding area and other local businesses and attractions to create an experience that is unique to this location," Loveman said. "The Total Rewards network and World Series of Poker position Horseshoe Casino Baltimore to serve as the region's premier gaming destination and a catalyst for economic development. We are confident our guests will respond just as enthusiastically to this offering as we are to bring them the experience."

Horseshoe Casino Baltimore boasts more than just world-class gaming amenities. In addition to the more than 2,500 slots, 100 table games and World Series of Poker® room the entertainment complex features a variety of nightlife options such as 14forty, a 24 hour multi-level entertainment venue, and signature restaurants from celebrity chefs Guy Fieri, Aaron Sanchez and John Besh.

"Horseshoe Casino Baltimore is designed for today's modern entertainment seeker," said Mitch Garber, CEO of Caesars Acquisition Company. "This multi-level, multi-sensory entertainment experience is unlike any other casino experience found in the region and is exactly the type of growth asset Caesars Growth Partners was formed to pursue."

Horseshoe Casino Baltimore is expected to draw visitors from across the region and further fuel Baltimore's flourishing tourism industry. Already the development has created an economic windfall for the city, creating approximately 2,000 construction job and 1,700 permanent positions. More than 50 percent of the casino's 1,700 new hires are from the greater Baltimore area.

"After more than two years of planning, collaboration and construction, we are thrilled to host our grand opening event this evening," said Horseshoe Casino Baltimore Senior Vice President and General Manager Chad Barnhill. "The Baltimore community has opened their arms wide to us and been incredibly welcoming. We are eager to return the favor. We have created a world-class casino for Charm City and we cannot wait to share our new home with the community."

A star-studded private grand opening event with a who's who list of Baltimore's most influential citizens is planned for this evening. The casino will open its doors to the general public at 9 p.m. Following the attraction's grand opening, Horseshoe Casino Baltimore will remain open to guests 24 hours a day.

## About Horseshoe Casino Baltimore
Horseshoe Casino Baltimore, developed by CBAC Borrower, LLC, is located along Russell Street on Baltimore's south side. As a city-integrated casino, it is designed to maximize connectivity with existing hospitality operators, neighboring sports venues M&T Bank Stadium and Oriole Park at Camden Yards, and the city's famed Inner Harbor. Opened in August 2014, the casino will employ 1,700 team members and house 2,500 video lottery terminals, 100 table games and a 25-hand World Series of Poker-branded poker room amid 122,000 square feet of gaming space. CBAC Borrower, LLC is controlled by Caesars Growth Partners, LLC (CGP), a joint venture between Caesars Entertainment Corporation and Caesars Acquisition Company, together with a world-class consortium of partners consisting of Rock Gaming LLC; CVPR Gaming Holdings, LLC; STRON-MD and PRT TWO, LLC boasting unmatched expertise and a proven track record in gaming development and operations, entertainment, capital management and urban development and renewal. Horseshoe Baltimore is managed by a subsidiary of Caesars Entertainment Corporation.

## About Caesars Entertainment
Caesars Entertainment Corporation is the world's most diversified casino-entertainment provider and the most geographically diverse U.S. casino-entertainment company. Since its beginning in Reno, Nevada, 75 years ago, Caesars has grown through development of new resorts, expansions and acquisitions and now operates casinos on three continents. The Company's resorts operate primarily under the Caesars®, Harrah's® and Horseshoe® brand names. Caesars also owns the London Clubs International family of casinos. Caesars is focused on building loyalty and value with its guests through a unique combination of great service, excellent products, unsurpassed distribution, operational excellence and technology leadership. The Company is committed to environmental sustainability and energy conservation and recognizes the importance of being a responsible steward of the environment. For more information, please visit www.caesars.com.

## About Caesars Acquisition Company
Caesars Growth Partners, LLC is a casino asset and entertainment company focused on acquiring and developing a portfolio of high-growth operating assets and equity and debt investments in the gaming and interactive entertainment industries. Through its two businesses - Interactive Entertainment and Casino Properties and Developments - Caesars Growth Partners focuses on acquiring or developing assets with strong value creation potential and leveraging interactive technology with its well-known online and mobile game portfolio and leading brands. Assets include Caesars Interactive Entertainment (with its social and mobile games, the World Series of Poker and regulated online real-money gaming businesses), Planet Hollywood, Bally's Las Vegas, The Cromwell, The Quad Resort & Casino, Harrah's New Orleans and Horseshoe Baltimore (currently being developed by a joint venture). Through its relationship with Caesars Entertainment, Caesars Growth Partners has the ability to access Caesars Entertainment's proven management expertise, brand equity, Total Rewards loyalty program and structural synergies. For more information, please visit www.caesarsacquisitioncompany.com.

Photo - http://photos.prnewswire.com/prnh/20140826/139941

SOURCE Caesars Entertainment

News Provided by Acquire Media

# EXHIBIT 4

# EXHIBIT 4

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

## FORM 8-K

---

### CURRENT REPORT
### Pursuant to Section 13 or 15(d)
### of the Securities Exchange Act of 1934

### June 13, 2017
### Date of Report (Date of earliest event reported)

---

# Caesars Entertainment Corporation
### (Exact name of registrant as specified in its charter)

| | | |
|---|---|---|
| **Delaware** | **001-10410** | **62-1411755** |
| (State of Incorporation) | (Commission File Number) | (IRS Employer Identification Number) |

**One Caesars Palace Drive
Las Vegas, Nevada 89109**
(Address of principal executive offices) (Zip Code)

**(702) 407-6000**
(Registrant's telephone number, including area code)

**N/A**
(Former Name or Former Address, if Changed Since Last Report)

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

- ☒ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
- ☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
- ☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))
- ☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 8.01**        **Other Events.**

On June 13, 2017, CBAC Borrower, LLC ("CBAC"), the owner of the Horseshoe Baltimore and a subsidiary of a joint venture among Caesars Growth Partners, LLC, a joint venture between Caesars Entertainment Corporation ("CEC") and Caesars Acquisition Company ("CAC"), an affiliate of Jack Entertainment LLC and other local investors, launched the syndication of up to $315 million of new senior secured credit facilities (the "Senior Facilities"), consisting of up to $300 million in the aggregate principal amount of a seven-year senior secured term loan facility (the "Term Facility") and up to $15 million in the aggregate principal amount of a five-year senior secured revolving credit facility. The proceeds from the Term Facility will be used to refinance CBAC's existing credit facility and existing furniture, fixtures and equipment financing facility. The proposed refinancing transaction is subject to market and other conditions, and may not occur as described or at all.

CEC is filing as Exhibit 99.1 to this Current Report on Form 8-K the lender presentation (the "Lender Presentation") that was provided on June 13, 2017 to potential lenders for the proposed Senior Facilities. In addition, CEC is disclosing the information attached to this report as Exhibit 99.2 (the "Disclosure Material"), which was also provided to the potential lenders. The Lender Presentation and the Disclosure Material are incorporated into this Item 8.01 by reference.

**Important Additional Information**

Pursuant to the Amended and Restated Agreement and Plan of Merger, dated as of July 9, 2016, between CEC and CAC, as subsequently amended on February 20, 2017 (as amended, the "Merger Agreement"), among other things, CAC will merge with and into CEC, with CEC as the surviving company (the "Merger"). In connection with the Merger, CEC and CAC filed with the Securities and Exchange Commission (the "SEC") a registration statement on Form S-4 on March 13, 2017, and Amendment No. 1 to such registration statement on Form S-4 on June 5, 2017 ("Amendment No. 1 to the Form S-4"), which includes a preliminary joint proxy statement/prospectus, as well as other relevant documents concerning the proposed transaction. The registration statement has not yet become effective. After the registration statement is declared effective by the SEC, a definitive joint proxy statement/prospectus will be mailed to stockholders of CEC and CAC. Stockholders are urged to read the registration statement and joint proxy statement/prospectus regarding the Merger and any other relevant documents filed with the SEC, as well as any amendments or supplements to those documents, because they will contain important information. You will be able to obtain a free copy of such joint proxy statement/prospectus, as well as other filings containing information about CEC and CAC, at the SEC's website (www.sec.gov), from CEC Investor Relations (investor.caesars.com) or from CAC Investor Relations (investor.caesarsacquisitioncompany.com).

The information in this communication is for informational purposes only and is neither an offer to purchase, nor a solicitation of an offer to sell, subscribe for or buy any securities or the solicitation of any vote or approval in any jurisdiction pursuant to or in connection with the proposed transactions or otherwise, nor shall there be any sale, issuance or transfer of securities in any jurisdiction in contravention of applicable law. No offer of securities shall be made except by means of a prospectus meeting the requirements of Section 10 of the Securities Act of 1933, as amended, and otherwise in accordance with applicable law.

CEC, CAC and their respective directors, executive officers and certain other members of management and employees may be soliciting proxies from CEC and CAC stockholders in favor of the business combination transaction. Information regarding the persons who may, under the rules of the SEC, be considered participants in the solicitation of the CEC and CAC stockholders in connection with the proposed business combination transaction is set forth in Amendment No. 1 to the Form S-4 filed with the SEC on June 5, 2017 and Amendment No. 1 to the Annual Report on Form 10-K for CAC's fiscal year ended December 31, 2016, filed on March 31, 2017. You can obtain free copies of these documents from CEC and CAC in the manner set forth above.

**Forward-Looking Statements**

This filing includes "forward-looking statements" intended to qualify for the safe harbor from liability established by the Private Securities Litigation Reform Act of 1995. You can identify these statements by the fact that they do not relate strictly to historical or current facts and by the use of words such as, "will," "may," "potential," and "propose" or the negative or other variations thereof or comparable terminology. In particular, they

# Transaction Overview



**Company Overview**

- CBAC Borrower, LLC ( "CBAC" or the "Company") owns the Horseshoe Baltimore ("Horseshoe" or the "Property") in Baltimore, Maryland with:
  - 2,202 slots and 177 tables (includes 25 poker tables)
- CBAC generated LTM 3/31/2017 net revenue and Adjusted EBITDA of $321.1 million and $68.4 million, respectively, and a 21.3% Adjusted EBITDA margin
- Management believes that 2017E net revenue and Adjusted EBITDA will be approximately $294 to $304 million and $48 to $58 million, respectively, primarily driven by the impact of a new competitor opening in the market
- Caesars Entertainment Corporation ("CEC" or "CZR," and CEC together with its subsidiaries, "Caesars"), Caesars Acquisition Company ("CAC") and Rock Gaming Mothership LLC ("Rock") own their interest through CR Baltimore Holdings LLC ("CRBH") which forms a joint venture together with Caves Valley Partners (with A&R Companies) ("CVPR"), STRON-MD, and PRT Two (collectively the "Investors")
  - A subsidiary of Caesars Entertainment Operating Company, Inc. manages operations under the Horseshoe brand

**Financing Overview**

- Refinance existing capital structure with proceeds from a $315.0 million Secured Credit Facility:
  - $15.0 million senior secured Revolving Credit Facility ("Revolver")
  - $300.0 million senior secured Term Loan B ("Term Loan B")
- Pro forma for the transaction, the Company will materially reduce annual interest expense, enhance asset cash flows and transition capital structure from an in-place construction loan to a true operating loan
- Pro forma total leverage will be 4.5x based on 3/31/2017 LTM Adjusted EBITDA of $68.4 million and 3.9x based on Adjusted EBITDAM



# EXHIBIT 5

# EXHIBIT 5

# SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549
## FORM 10-K

(Mark One)

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

FOR THE FISCAL YEAR ENDED December 31, 2015

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

Commission File No. I-10410

# CAESARS ENTERTAINMENT CORPORATION
### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **62-1411755** |
| (State of incorporation) | (I.R.S. Employer Identification No.) |
| **One Caesars Palace Drive, Las Vegas, Nevada** | **89109** |
| (Address of principal executive offices) | (Zip code) |

Registrant's telephone number, including area code:
**(702) 407-6000**

## SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common stock, $0.01 par value | NASDAQ Global Select Market |

## SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:

None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐   No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| | | | |
|---|---|---|---|
| Large accelerated filer ☐ | Accelerated filer ☒ | Non-accelerated filer ☐ | Smaller reporting company ☐ |
| | | (Do not check if a smaller reporting company) | |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐   No ☒

The aggregate market value of common stock held by non-affiliates of the registrant as of June 30, 2015 was $351 million.

As of February 15, 2016, the registrant had 145,143,581 shares of Common Stock outstanding.

*Organizational Structure*

The following diagram illustrates the key entities and subsidiaries in the Caesars Entertainment organizational structure. This diagram does not include all legal entities and subsidiaries.



(1) CEOC filed for bankruptcy protection under Chapter 11 of the US Bankruptcy Code on January 15, 2015 and was no longer consolidated within CEC as a result. See Note 3.
(2) CAC is party to the series of transactions that formed CGP and owns 100% of the voting membership units in CGP. Caesars owns 100% of the non-voting membership units in CGP and consolidates CGP as a variable interest entity. See Note 2. See information about Caesars' announced merger with CAC in Note 1.
(3) Ownership held by Caesars Growth Properties Holding, LLC ("CGPH"), a subsidiary of CGP.
(4) CES is a services joint venture formed by CEOC, CERP, and CGPH. See Note 2.
(5) Our reportable segments include CERP, CGP Casinos, and CIE. CGP Casinos is comprised of all subsidiaries of CGP excluding CIE. CEOC remained a reportable segment until its deconsolidation effective January 15, 2015. See Note 1 and Note 3.

As of December 31, 2015, through our consolidated entities, we owned and operated 12 casinos in the United States, with over one million square feet of gaming space and over 23,000 hotel rooms. Our properties are concentrated in Las Vegas, where eight of the twelve are located. See Item 2 for more information about our properties.

*Caesars Entertainment Resort Properties, LLC.* Operates six casinos in the United States and The LINQ promenade along with leasing Octavius Tower at Caesars Palace Las Vegas ("Octavius Tower") to CEOC and gaming space at The LINQ promenade to CGP.

*Caesars Growth Partners, LLC.* Operates six casinos in the United States and, through its subsidiary Caesars Interactive Entertainment, Inc. ("CIE"), owns and operates (1) an online business providing social and mobile games, (2) regulated online real money gaming and (3) the World Series of Poker ("WSOP") tournaments and brand.

*Caesars Enterprise Services, LLC ("CES").* As described more fully in Note 1, CES is a joint venture formed by CERP, CEOC, and CGPH (collectively, the "Members") that provides certain corporate and administrative services for the Members' casino properties, including substantially all of the 28 casino properties owned by CEOC, and ten casinos owned by unrelated third parties (including four Indian tribal properties). CES also manages certain enterprise assets and the other assets it owns, licenses or controls, and employs certain of the corresponding employees. (See Note 1)

2

*CGP Casinos*

*Horseshoe Baltimore*

CGP Casinos benefited from a full year of operations from Horseshoe Baltimore, which opened in the third quarter of 2014. Horseshoe Baltimore net revenues increased to $310 million in 2015 compared with $108 million in 2014. The $202 million increase in net revenue was primarily comprised of $189 million in casino revenues and $15 million in food and beverage revenues.

*The Cromwell*

CGP Casinos benefited from a full-year of operations from The Cromwell in 2015, which opened in the second quarter of 2014, after being closed for renovations since the first quarter of 2013. The Cromwell opening included the addition of *Giada's* and *Drai's Beach Club - Nightclub*. The Cromwell net revenues increased to $86 million in 2015 compared with $58 million in 2014. The $28 million increase in net revenue was primarily comprised of $14 million in casino revenues, $10 million in food and beverage revenues, and $5 million in rooms revenues.

*The LINQ Hotel & Casino Renovations*

We continue to view hotel renovations as an attractive and low risk use of available cash. CGP Casinos completed its room renovations project at The LINQ Hotel & Casino ("The LINQ Hotel") during the first half of 2015. The increased revenue from the newly-renovated rooms contributed to CGP Casinos' increase in cash ADR in 2015. This improvement combined with a 32% increase in the number of rooms nights available in 2015 compared with 2014 drove the $37 million increase in rooms revenue attributable to The LINQ Hotel. The higher volume of guests and visitors subsequent to construction also led to increases of $18 million in casino revenues and $13 million in food and beverage revenues.

*CIE*

*Growth in CIE's Social and Mobile Games Business*

CIE net revenues increased to $766 million in 2015 compared with $587 million in 2014 and $317 million in 2013. CIE has continued to experience strong organic growth in social and mobile games due to the focus on increasing the number of users and the conversion of those users into players who purchase CIE's virtual currency. CIE also realized a full-year benefit in 2015 from the February 2014 acquisition of Pacific Interactive and its first full-year benefit in 2014 of the roll-out of online real-money gaming in Nevada and New Jersey.

*Other Key Drivers and Events*

*Cost Saving Initiatives*

In the fourth quarter of 2014, we began implementing various cost saving initiatives across the company. These initiatives have yielded a reduction in variable marketing programs, such as REEL REWARDS, discounts, and free play, that are treated as a reduction in revenue. Additionally, we had a reduction in payroll, which resulted in reductions in casino and other direct expenses. We estimate the benefit from these initiatives was approximately $100 million for those entities that remain in the consolidated Caesars entity as of December 31, 2015.

*Favorable Gaming Hold*

Gaming hold (defined below) was favorable in 2015 compared with 2014 and contributed approximately $28 million to $35 million to net revenues in 2015, primarily in Las Vegas. Approximately $15 million to $18 million was related to CERP, and approximately $13 million to $16 million was related to CGP Casinos.

*Expansion of Resort Fees*

We expanded our resort fee program to all properties in our portfolio, which drove most of the increase in rooms revenue in 2015. Resort fees were originally initiated in the first quarter of 2013 primarily for our Las Vegas properties.

35

# EXHIBIT 6

# EXHIBIT 6

**COVID-19 Update ▶**



ℰ HORSESHOE

📱 BOOK NOW    🏷 DEALS    📍 CASINO LOCATOR    CAESARS REWARDS    SIGN IN    JOIN

LOCATIONS    EVENTS    GROUPS & MEETINGS    HIS...    PLAY ONLINE NOW!

## BOOK A ROOM

Las Vegas ▼

☐ My Dates Are Flexible

Check In 📅    Check Out 📅

1 Room ▼

Room 1 (4 guests max per room)

2 Adults ▼    0 Children ▼

Add Promo Or Package Code ⚙

Additional Discounts for Military, First Responders, Students, & Teachers

**CHECK BEST RATES ▶**

Existing Reservation

✿ BEST RATE GUARANTEE

# EARN TIER CRE

Receive 100 Tier Credits towards your 2...
October 1 and December 31, 2019

LEARN MORE

# HORSESHOE LOCATIONS



## HORSESHOE BALTIMORE

Horseshoe Baltimore features slots, table games and a World Series of Poker (WSOP) room as well as three premier restaurant, authentic



## HORSESHOE HAMMOND

Located just 20 minutes from downtown Chicago, Horseshoe Hammond Casino is the premier entertainment and gambling destination in



## HORSESHOE BOSSIER CITY

From the moment you enter our hotel lobby, you'll see that Horseshoe Bossier City has placed luxury and comfort at the top of our

COVID-19 Update ▶

CZR ⬇ (-0.05) USD $7.88    Follow us:    |  Find and Reserve  |  **CAESARS** REWARDS

 THIS IS CAESARS    CORPORATE SOCIAL RESPONSIBILITY    INVESTORS  |  HOTEL DEVELOPMENT

MAR 16, 2020

# HORSESHOE BALTIMORE ANNOUNCES TEMPORARY CLOSURE





Today, Maryland Governor Larry Hogan issued an emergency order to close all Maryland casinos, racetracks, and simulcast betting facilities to the public indefinitely, due to the serious public health emergency created by the COVID-19 pandemic.

https://www.caesars.com/corporate/newsroom/press-releases/

COVID-19 Update ▶

CZR ⬇ (-0.05) USD $7.88    Follow us:    |  Find and Reserve  |  **CAESARS** REWARDS

  THIS IS CAESARS    CORPORATE SOCIAL RESPONSIBILITY    INVESTORS    HOTEL DEVELOPMENT

This decision is a precautionary measure only, made to ensure we are in compliance with local rules and regulations.

During the closure, Horseshoe Baltimore will be paying two weeks of pay to all team members and benefits will not be interrupted.

Horseshoe Baltimore is closely monitoring this evolving situation and will work with local officials to establish a reopening date as soon as it is appropriate to do so. We look forward to welcoming back team members and guests soon.

Caesars has implemented enhanced cleaning and sanitizing protocols throughout our facilities, based on recommendations of the Centers for Disease Control. More information on those protocols is available here.

         

Caesars Entertainment and Eldorado Resorts Merger | Merger FAQ for Guests | Coronavirus Guest Information

This Is Caesars Entertainment | Careers | Investor Relations | Become an Affiliate | Media Center | Meetings and Conferences | Email Offers

Responsible Gaming | Responsible Conduct

# EXHIBIT 7

# EXHIBIT 7



**COVID-19 Update ▶**

CZR ▲ (+0.17) USD
$8.05

Follow us:  [f] [twitter] [youtube] [instagram]  |  Find and Reserve  |  **CAESARS** REWARDS

🔍      THIS IS CAESARS      CORPORATE SOCIAL RESPONSIBILITY      INVESTORS  |  HOTEL DEVELOPM

# CAESARS

[f] [twitter] [✉]





**Reno, Nev. and Las Vegas, Nev. (November 15, 2019)** –Eldorado Resorts, Inc. (NASDAQ: ERI) ("Eldorado") and Caesars Entertainment Corporation (NASDAQ: CZR) ("Caesars") announced that, at separate Special Meetings of Stockholders today, their respective stockholders approved certain actions in connection with Eldorado's acquisition of Caesars. The transaction is expected to be consummated in the first half of 2020 and remains subject to the receipt of all required regulatory approvals, and other closing conditions.

Holders of over 99% of the Eldorado shares that voted on the issuance of shares of Eldorado common stock in connection with transactions contemplated by the merger agreement with Caesars cast their votes in favor, representing approximately 87% of Eldorado's outstanding common stock as of the record date for the Eldorado stockholder meeting. Holders of over 99% of the Caesars shares that voted on the merger cast their votes in favor, representing approximately 76% of Caesars' common stock outstanding and entitled to vote as of the record date for the Caesars stockholder meeting. Eldorado and Caesars stockholders also approved each of the other matters on their respective meeting agendas, including the Eldorado stockholders' approval of the reincorporation of Eldorado from Nevada to Delaware subject to and promptly following the consummation of the merger.



## ELDORADO TO COMBINE WITH CAESARS CREATING THE
## LARGEST OWNER AND OPERATOR OF U.S. GAMING ASSETS

- *COMBINES ICONIC GLOBAL BRANDS AND INDUSTRY-LEADING LOYALTY PROGRAM WITH EXCEPTIONAL GUEST SERVICES AND OPERATIONAL EXCELLENCE*

- *INCREASED SCALE AND GEOGRAPHIC DIVERSIFICATION ACROSS APPROXIMATELY 60 DOMESTIC GAMING PROPERTIES*

- *IDENTIFIED SYNERGIES OF $500 MILLION WITH LONGER-TERM UPSIDE*

- *$3.2 BILLION STRATEGIC TRANSACTION WITH VICI PROVIDES SIGNIFICANT PROCEEDS FROM LEASE MODIFICATIONS AND REAL ESTATE MONETIZATION*

- *EXPECTED TO BE IMMEDIATELY ACCRETIVE TO FREE CASH FLOW*

- *CONTINUED OWNERSHIP OF REAL ESTATE ACROSS BOTH PORTFOLIOS PRESERVES INHERENT VALUE*

- *ELDORADO'S CHAIRMAN GARY CARANO, CEO TOM REEG, COO, CFO AND CLO WILL LEAD THE COMBINED COMPANY, WHICH WILL USE THE CAESARS NAME*

- *COMPANY TO BE HEADQUARTERED IN RENO, NEVADA AND WILL RETAIN SIGNIFICANT CORPORATE PRESENCE IN LAS VEGAS*

RENO and LAS VEGAS, Nev. June 24, 2019 – Eldorado Resorts, Inc. (NASDAQ: ERI) ("Eldorado," "ERI," or "the Company") and Caesars Entertainment Corporation (NASDAQ: CZR) ("Caesars") announced that they have entered into a definitive merger agreement to create the largest U.S. gaming company. The proposed transaction will combine two leading gaming companies with complementary national operating platforms, strong brands, strategic industry alliances, and a collective commitment to enhancing guest service and shareholder value. The combined company will provide its guests with access to approximately 60 domestic casino–resorts and gaming facilities across 16 states. The transaction is transformational for each company's shareholders, employees and customers, combining Eldorado's operational expertise with Caesars industry-leading loyalty program, regional network and Las Vegas assets.

### Summary of Caesars Transaction

Eldorado will acquire all of the outstanding shares of Caesars for a total value of $12.75 per share, consisting of $8.40 per share in cash consideration and 0.0899 shares of Eldorado common stock for each Caesars share of common stock based on Eldorado's 30-calendar day volume weighted average price per share as of May 23, 2019, reflecting total consideration of approximately $17.3 billion, comprised of $7.2 billion in cash, approximately 77 million Eldorado common shares and the assumption of Caesars outstanding net debt (excluding face value of the existing convertible note). Caesars shareholders will be offered a consideration election mechanism that is subject to proration pursuant to the definitive merger agreement. Giving effect to the transaction, Eldorado and Caesars shareholders will hold approximately 51% and 49% of the combined company's outstanding shares, respectively.

Upon completion of the transaction the combined company will retain the Caesars name to capitalize on the value of the iconic global brand and its legacy of leadership in the global gaming industry. The new company will continue to trade on the Nasdaq Global Select Market.

### Strategic Rationale of Caesars Combination

- **Largest and Most Diversified Domestic Footprint and Scale:** Unrivaled domestic footprint of approximately 60 owned, operated and managed casino–resorts across 16 states, creating nation's preeminent diversified gaming and entertainment company
- **Best-in-Class Leadership:** Eldorado's proven decentralized operating model combined with its history of completing successful, value-building transactions through effective financial management to drive improved margins and create value for both shareholders and guests
- **Iconic Brands and New Gaming Opportunities Will Enhance Customer Experience:** Combines iconic global brands and industry-leading Caesars Rewards loyalty program with proven guest service focus to drive value across the expanded regional network, including access to attractive properties in Las Vegas and other gaming markets around the country

- **Completion of Las Vegas Strip Room Remodels in 2021:** Caesars Las Vegas asset portfolio has recently undergone $1.2 billion of enhancements and room remodels that positions the portfolio for improved operating performance in the near-term

- **Significant Identified Synergies:** Eldorado management has a demonstrated track record of successfully integrating acquired companies and achieving stated synergy targets and expects to achieve approximately $500 million of synergies in the first year following closing. Additionally, Eldorado sees long-term cost and revenue synergy upside opportunities

## Summary of $3.2 Billion Strategic Transaction with VICI

VICI Properties, Inc. (NYSE: VICI) ("VICI") and Eldorado have entered into a master transaction agreement in connection with the acquisition of the real estate of three assets and amendment of existing leases and right of first refusals. Furthermore, in connection with the transaction, the parties have agreed to the following:

- VICI will acquire the real estate associated with Harrah's Resort Atlantic City, Harrah's Laughlin Hotel & Casino, and Harrah's New Orleans Hotel & Casino for approximately $1.8 billion. The properties will be added to an existing master lease and will have an initial annual rent of approximately $154 million. The proceeds from this transaction represent a rent multiple of 11.75x;

- An amendment to the terms of the existing CPLV and HLV single asset leases, following closing of the transaction, which will result in a combination of these existing leases into a new Las Vegas master lease and an increase in the annual rent payment on the Las Vegas master lease of $98.5 million, resulting in proceeds of approximately $1.4 billion. The proceeds represent a rent multiple of 14.25x;

- A put/call option on Caesars Centaur assets at a 12.5x put rent multiple / 13.0x call rent multiple, exercisable between January 2022 and December 2024; and,

- VICI granted right of first refusals for whole asset sale or sale-leaseback transactions on two Las Vegas Strip properties and Horseshoe Casino Baltimore

## Optimized Lease Structure and Balance Sheet

- **Win-Win Transaction with VICI:** Strategic transaction with VICI encompassing amendments to existing leases and acquisition of the real estate of three properties generates $3.2 billion of gross proceeds to immediately strengthen the combined company's balance sheet, while providing growth for VICI

- **Attractive Financial Profile:** Materially enhanced financial scale and flexibility with additional growth and stability driven by the world's largest gaming customer database

- **Commitment to a Strong Balance Sheet:** Transaction expected to be immediately accretive to free cash flow with significant cash flows from the combined company to be allocated to leverage reduction

**Tom Reeg, Chief Executive Officer of Eldorado, commented,** "Eldorado's combination with Caesars will create the largest owner and operator of U.S. gaming assets and is a strategically, financially and operationally compelling opportunity that brings immediate and long-term value to stakeholders of both companies. Together, we will have an extremely powerful suite of iconic gaming and entertainment brands, as well as valuable strategic alliances with industry leaders in sports betting and online gaming. The combined entity will serve customers in essentially every major U.S. gaming market and will marry best-of-breed practices from both entities to ensure high levels of customer satisfaction and significant shareholder returns.

"As with our past transactions, we have a detailed plan for significant synergy realization. Relative to our prior acquisitions, the combination with Caesars presents attractive incremental revenue synergy opportunities as we plan to strengthen Caesars Rewards, the industry's leading player loyalty and CMS database, and combine it with Eldorado's to market to over 65 million rewards customers nationally. Additionally, the transaction bears benefits beyond the strategic merits of the combination with Caesars in isolation. Our agreement with VICI favorably positions both platforms by enhancing the value of our combined company's assets and further solidifies the growth profile of VICI.

"Eldorado's history of completing successful, value-enhancing transactions has focused on prioritizing operating discipline with the goal of delivering best-in-class gaming and entertainment experiences and amenities to customers, unlocking the long-term value of acquired companies and assets through effective financial management, and completing return-focused investments in our properties that elevate the guest experience as well as our competitive position and overall returns. We intend to allocate the significant free cash flow from the combined company to reduce leverage while investing to improve the customer experience across the platform. We could not be more excited about the future as we bring together two industry leaders that will generate significant opportunities for our employees, customers, partners and shareholders."

**Jim Hunt, Chairman of Caesars, said,** "This announcement is the culmination of a thorough evaluation by the Caesars Board of Directors. The Board unanimously concluded that the combination of these two companies creating an even stronger entity is a decision for our shareholders' consideration and vote for immediate and ongoing value."

**Tony Rodio, Chief Executive Officer of Caesars, added,** "We believe this combination will build on the accomplishments and best-in-class operating practices of both companies. I'm familiar with Eldorado and its management team, having worked with them on a

previous transaction, and I look forward to collaborating with them to bring our companies together. We are excited to integrate Caesars Rewards with the combined portfolio. The incorporation of Caesars Rewards has produced strong results at the recently acquired Centaur properties. By joining forces, we believe the new Caesars will be well-positioned to compete in our dynamic industry."

**Ed Pitoniak, Chief Executive Officer of VICI, said,** "VICI is honored and excited to be integrally involved with Eldorado in this transformative transaction. As a REIT, we seek to partner with operators who have the most powerful, valuable and enduring relationships with the end users of our real estate. Under Tom Reeg's leadership and front-line focus, the combination of Eldorado and Caesars will yield the most compelling guest experiences and network effect in American gaming."

## Governance and Timing

- The combined company's Board of Directors will consist of 11 members, six of whom will come from Eldorado's Board of Directors and five of whom will come from Caesars Board of Directors

- The transactions have been unanimously approved by the Boards of Directors of Eldorado, Caesars and VICI. The Caesars transaction is subject to approval of the stockholders of Eldorado and Caesars, the approval of applicable gaming authorities, the expiration of the applicable Hart-Scott-Rodino waiting period and other customary closing conditions, and is expected to be consummated in the first half of 2020

## Advisors

J.P. Morgan, Credit Suisse and Macquarie Capital are serving as financial advisors to Eldorado. Milbank LLP and Latham & Watkins LLP are serving as Eldorado's legal counsel. PJT Partners LP is serving as financial advisor to Caesars. Skadden, Arps, Slate, Meagher & Flom LLP is serving as Caesars legal counsel.

## Conference Call, Webcast, Investor Presentation

Eldorado will host a conference call today, June 24, at 8:15 a.m. ET to review the transaction and host a question and answer session. To access the conference call, interested parties may dial 201-493-6780 (domestic and international callers). Participants can also listen to a live webcast of the call from Eldorado's website at ir.eldoradoresorts.com. During the conference call and webcast, management will review a presentation summarizing the proposed transaction which can be accessed at ir.eldoradoresorts.com. A webcast replay will be available for 90 days following the live event at ir.eldoradoresorts.com. Please call five minutes in advance to ensure that you are connected. Questions and answers will be taken only from participants on the conference call. For the webcast, please allow 15 minutes to register, download and install any necessary software.

## Analyst/Investor Meeting

Eldorado CEO, Tom Reeg and CFO, Bret Yunker will host a live meeting and question and answer session with analysts and institutional investors Tuesday, June 25, 2019 at 8:00 a.m. ET in New York City. Participation in the meeting is by confirmed RSVP only and if you are interested in attending the meeting, please contact JCIR at 212-835-8500 for location and other details.

## About Eldorado

Eldorado is a leading casino entertainment company that owns and operates twenty-six properties in twelve states, including Colorado, Florida, Illinois, Indiana, Iowa, Louisiana, Mississippi, Missouri, Nevada, New Jersey, and Ohio. In aggregate, Eldorado's properties feature approximately 23,000 slot machines and VLTs and approximately 650 table games, and over 12,000 hotel rooms. For more information, please visit www.eldoradoresorts.com.

## About Caesars

Caesars is the world's most geographically diversified casino-entertainment company. Since its beginning in Reno, Nevada, in 1937, Caesars has grown through development of new resorts, expansions and acquisitions, and now operates casinos on three continents. The company's resorts operate primarily under the Harrah's®, Caesars® and Horseshoe® brand names. Caesars also owns the London Clubs International family of casinos. Caesars currently owns and operates 34 casinos and resorts in Kentucky, Illinois, Indiana, Iowa, Louisiana, Mississippi, Missouri, Nevada and New Jersey. Domestically, Caesars properties feature approximately 48,000 slot machines and VLTs and approximately 3,000 table games, and over 39,000 hotel rooms. The company is based in Las Vegas, Nevada. To learn more about Caesars, please visit www.caesars.com.

**Additional Information**

This communication does not constitute an offer to buy or solicitation of an offer to sell any securities. In connection with the proposed transaction, Eldorado intends to file with the SEC a registration statement on Form S-4 (the "registration statement") that will include a joint proxy statement of Eldorado and Caesars that also constitutes a prospectus of Eldorado and Caesars (the "joint proxy statement/prospectus"). Each of Eldorado and Caesars will provide the joint proxy statement/prospectus to their respective stockholders. Eldorado and Caesars also plan to file other relevant documents with the SEC regarding the proposed transaction. This document is not a substitute for the joint proxy statement/prospectus or registration statement or any other document which Eldorado or Caesars may file with the SEC in connection with the proposed transaction. INVESTORS AND SECURITY HOLDERS ARE URGED TO READ THE JOINT PROXY STATEMENT/PROSPECTUS AND OTHER RELEVANT DOCUMENTS FILED WITH THE SEC CAREFULLY AND IN THEIR ENTIRETY WHEN THEY BECOME AVAILABLE BECAUSE THEY WILL CONTAIN IMPORTANT INFORMATION ABOUT THE PROPOSED TRANSACTION. You may obtain a copy of the joint proxy statement/prospectus (when it becomes available), the registration statement (when it becomes available) and other relevant documents filed by Eldorado and Caesars without charge at the SEC's website, www.sec.gov, or by directing a request when such a filing is made to (1) Eldorado Resorts, Inc. by mail at 100 West Liberty Street, Suite 1150, Reno, Nevada 89501, Attention: Investor Relations, by telephone at (775) 328-0112 or by going to the Investor page on Eldorado's corporate website at www.eldoradoresorts.com; or (2) Caesars Entertainment Corporation by mail at Caesars Palace, One Caesars Palace Drive, Las Vegas, Nevada 89109, Attention: Investor Relations, by telephone at (800) 319-0047, or by going to the Investors page on Caesars' corporate website at investor.caesars.com.

**Certain Information Regarding Participants**

Eldorado, Caesars and certain of their respective directors and executive officers may be deemed to be participants in the solicitation of proxies from Eldorado and Caesars stockholders in respect of the proposed transaction under the rules of the SEC. You may obtain information regarding the names, affiliations and interests of Eldorado's directors and executive officers in Eldorado's Annual Report on Form 10-K for the year ended December 31, 2018, which was filed with the SEC on March 1, 2019, and its definitive proxy statement for its 2019 Annual Meeting, which was filed with the SEC on April 26, 2019.

Investors may obtain information regarding the names, affiliations and interests of Caesars's directors and executive officers in Caesars's Annual Report on Form 10-K for the year ended December 31, 2018, which was filed with the SEC on February 22, 2019, and its proxy statement for its 2019 Annual Meeting, which was filed with the SEC on May 15, 2019. Other information regarding the participants in the proxy solicitation and a description of their direct and indirect interests, by security holdings or otherwise, will be contained in the joint proxy statement/prospectus and other relevant materials to be filed with the SEC regarding the proposed transaction if and when they become available. Investors should read the joint proxy statement/prospectus carefully and in its entirety when it becomes available before making any voting or investment decisions.

**Forward-Looking Statements**

*This communication contains forward-looking statements within the meaning the federal securities laws, including Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended, and of the Private Securities Litigation Reform Act of 1995. These forward-looking statements are based on the current expectations of Eldorado and Caesars and are subject to uncertainty and changes in circumstances. These forward-looking statements include, among others, statements regarding the expected synergies and benefits of a potential combination of Eldorado and Caesars, including the expected accretive effect of the proposed transaction on Eldorado's results of operations; the anticipated benefits of geographic diversity that would result from the proposed transaction and the expected results of Caesars' gaming properties; expectations about future business plans, prospective performance and opportunities; required regulatory approvals; the expected timing of the completion of the proposed transaction; and the anticipated financing of the proposed transaction. These forward-looking statements may be identified by the use of words such as "expect," "anticipate," "believe," "estimate," "potential," "should," "will" or similar words intended to identify information that is not historical in nature. The inclusion of such statements should not be regarded as a representation that such plans, estimates or expectations will be achieved. There is no assurance that the proposed transaction will be consummated, and there are a number of risks and uncertainties that could cause actual results to differ materially from the forward-looking statements made herein. These risks and uncertainties include: (a)*

risks related to the combination of Caesars and Eldorado and the integration of their respective businesses and assets; (b) the possibility that the proposed transaction with Caesars and the real estate transactions with VICI do not close when expected or at all because required regulatory, shareholder or other approvals are not received or other conditions to the closing are not satisfied on a timely basis or at all; (c) the risk that the financing required to fund the proposed transaction is not obtained on the terms anticipated or at all; (d) potential adverse reactions or changes to business or employee relationships, including those resulting from the announcement or completion of the proposed transaction; (e) potential litigation challenging the proposed transaction; (f) the possibility that the anticipated benefits of the proposed transaction, including cost savings and expected synergies, are not realized when expected or at all, including as a result of the impact of, or issues arising from, the integration of the two companies; (g) conditions imposed on the companies in order to obtain required regulatory approvals; (h) uncertainties in the global economy and credit markets and its potential impact on Eldorado's ability to finance the proposed transaction; (i) the possibility that the proposed transaction may be more expensive to complete than anticipated, including as a result of unexpected factors or events; (j) diversion of management's attention from ongoing business operations and opportunities; (k) the ability to retain certain key employees of Eldorado or Caesars; (l) risks associated with increased leverage from the proposed transaction; (m) changes in the value of Eldorado's common stock between the date of the merger agreement and the closing of the proposed transaction; (n) competitive responses to the proposed transaction; (o) legislative, regulatory and economic developments; (p) uncertainties as to the timing of the consummation of the proposed transaction and the ability of each party to consummate the proposed transaction; and (q) additional factors discussed in the sections entitled "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Eldorado's and Caesars's respective most recent Annual Reports on Form 10-K and Quarterly Reports on Form 10-Q as filed with the Securities and Exchange Commission. Other unknown or unpredictable factors may also cause actual results to differ materially from those projected by the forward-looking statements. The forward-looking statements in this document speak only as of date of this document. These factors are difficult to anticipate and are generally beyond the control of Eldorado and Caesars. Neither Eldorado nor Caesars undertakes any obligation to release publicly any revisions to any forward-looking statements, to report events or to report the occurrence of unanticipated events unless required to do so by law.

**Contacts**

**For Eldorado Resorts, Inc.**
Joseph N. Jaffoni, Richard Land, James Leahy
JCIR
212-835-8500
eri@jcir.com

**For Caesars Entertainment Corporation**
Media:
Stephen Cohen
Stephen.cohen@teneo.com
347-489-6602

Investors:
Joyce Arpin
Jthomas@caesars.com
702-880-4707

# EXHIBIT 8

# EXHIBIT 8

**ENTERTAINMENT**

# Caesars-Eldorado merger moving forward

**PUBLISHED TUE, MAR 31 2020·3:29 PM EDT**



**Contessa Brewer**
@CONTESSABREWER

SHARE   f   𝕏   in   ✉

## KEY POINTS

- The planned merger between Caesars and Eldorado is moving forward despite a coronavirus-related shutdown of casinos.

- The anticipated closing of the $17.3 billion deal has been pushed from April to June.

- According to a source, both companies have enough liquidity to last for over a year.



CAESARS (CZR)
6.78 +0.36 [+5.61%]

INTRA DAY

6.90
6.75
6.60                                    6.78
6.42

VIDEO 00:01
Eldorado-Caesars deal to close in June: Sources



   

The coronavirus outbreak has delayed the $17.3 billion deal between casino companies Caesars Entertainment and Eldorado Resorts, but the deal is moving forward, according to a source with firsthand knowledge.

Following a report on CNBC, Caesars was halted on the news and reopened up 12%.

Indiana, New Jersey and Nevada regulators still need to sign off on the deal but have postponed hearings. The merger also needs the approval of the Federal Trade Commission.

"The board is still investigating," said Nevada Gaming Commission Chair Tony Alamo. "The merger is going like any other merger. It's just going through the process, which includes a normal investigation," he added.

Eldorado and Caesars had anticipated closing in mid-April, but multiple sources have told CNBC it now looks more like June. There has been widespread speculation that the coronavirus pandemic will change the ways regulators view the debt associated with this deal. A highly placed source says both companies have the liquidity to last for well over a year.

Caesars has $3 billion on its balance sheet and recently sold the Rio in Las Vegas for $460 million. That was an unexpected source of cash and was not factored into the deal. Assuming a $230 million asset sale of two casinos in Mississippi and Missouri to Twin River closes, anticipated in the next 60 days, Eldorado will have roughly $850 million on hand, a source tells CNBC.



  

# EXHIBIT 9

# EXHIBIT 9

# Section 1: 10-K (10-K)

## UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549
## FORM 10-K

(Mark One)

☒   ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2019

OR

☐   TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period          to

Commission File No. 001-36629

# ELDORADO RESORTS, INC.

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| Nevada | 46-3657681 |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

100 West Liberty Street, Suite 1150
Reno, Nevada 89501
(Address of principal executive offices)
Telephone: (775) 328-0100
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading symbol | Name of each exchange on which registered |
|---|---|---|
| Common Stock, $.00001, par value | ERI | NASDAQ Stock Market |

Securities registered pursuant to section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).   Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| Emerging growth company | ☐ | | |

If an emerging growth company, indicate by checkmark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

The aggregate market value of the common stock held by non-affiliates of the Registrant was $3.0 billion at June 28, 2019 based upon the closing price for the shares of ERI's common stock as reported by The Nasdaq Stock Market.

As of February 24, 2020, there were 77,796,891 outstanding shares of the Registrant's Common Stock, net of treasury shares.

### Documents Incorporated by Reference

Portions of the Registrant's definitive proxy statement to be filed with the Commission pursuant to Regulation 14A in connection with the Registrant's Annual Meeting of Stockholders (the "Proxy Statement") are incorporated by reference into Part III of this report. Such Proxy Statement will be filed with the Commission not later than 120 days after the conclusion of the Registrant's fiscal year ended December 31, 2019.

*The Merger is subject to the receipt of governmental approvals that may impose conditions that could have an adverse effect on us or, if not obtained, could prevent consummation of the Merger or, in some circumstances, require us to pay Caesars a termination fee of approximately $836.8 million.*

Consummation of the Merger is conditioned upon the receipt of certain governmental approvals, including, without limitation, antitrust and gaming regulatory approvals. Although we and Caesars have each agreed to use our reasonable best efforts to obtain the requisite governmental approvals, there can b no assurance that these approvals will be obtained and that the other conditions to consummating the Merger will be satisfied. In addition, the governmental authorities from which the regulatory approvals are required may impose conditions on the consummation of the Merger, including requirements to divest properties, or require changes to the terms of the Merger Agreement or other agreements to be entered into in connection with the Merger Agreement. Such conditions or changes and the process of obtaining regulatory approvals could have the effect of delaying or impeding consummation of the Merger, imposing additional costs or limitations on us following consummation of the Merger or materially limiting the revenue of the combined company after the consummation o the Merger, any of which might reduce the anticipated benefits to us of the Merger or have an adverse effect on our business, financial condition and results of operations. In addition, if the Merger Agreement is terminated (i) due to a law or order relating to gaming or antitrust laws that prohibits or permanently enjoins the consummation of the Merger, (ii) because the required regulatory approvals were not obtained prior to June 24, 2020 (as may be extended to a date no later than December 24, 2020 upon satisfaction of certain conditions to extension set forth in the Merger Agreement) or (iii) due to us willfully and materially breaching certain obligations with respect to the actions required to be taken by us to obtain required antitrust approvals, we will be required to pay Caesars a termination f of approximately $836.8 million.

*Antitrust approvals that are required to consummate the Merger may not be received, may take longer than expected or may impose conditions, including th requirement to divest assets, that could have an adverse effect on the combined company following the Merger.*

Under the provisions of the HSR Act, the Merger may not be consummated until filings are made with the Antitrust Division of the DOJ and the FTC and the expiration of a 30-calendar day waiting period, or the early termination of that waiting period, following the parties' filings. We and Caesars filed our respectiv notification and report forms under the HSR Act on July 16, 2019. On August 15, 2019, we withdrew our notification and report form and re-filed the same on August 19, 2019, which began a new 30-day waiting period. On September 18, 2019, each of we and Caesars received a Request for Additional Information and Documentary Material (a "Second Request") from the FTC in connection with the FTC's review of the Merger, which extends the waiting period until 30 days afte both parties have substantially complied with the Second Request, unless the FTC early terminates the additional waiting period or the parties otherwise agree no to consummate the Merger for a period of time after substantial compliance. We and Caesars are working with the FTC to complete its investigation as soon as practicable.

In addition, private parties who may be adversely affected by the Merger and individual states may bring legal actions under the antitrust laws in certain circumstances. Although we and Caesars believe the consummation of the Merger will not likely be prevented by antitrust laws, there can be no assurance that a challenge to the Merger on antitrust grounds will not be made or, if a challenge is made, what the result will be. Under the Merger Agreement, we and Caesars have agreed to use our reasonable best efforts to obtain all regulatory clearances necessary to consummate the Merger at the earliest practicable date.

In addition, in order to consummate the Merger, we and Caesars may be required to comply with conditions, terms, obligations or restrictions imposed by antitrust, gaming and other regulatory entities, including divestitures, and such conditions, terms, obligations or restrictions may have the effect of delaying consummation of the Merger, imposing additional material costs on or materially limiting the revenue of the combined company after the consummation of the Merger, or otherwise reducing the anticipated benefits to us of the Merger. Such conditions, terms, obligations or restrictions may result in the delay or abandonment of the Merger.

*Gaming regulatory approvals may not be received, may take longer than expected or may impose conditions that are not presently anticipated or cannot be met.*

Consummation of the Merger is conditioned on the receipt of approvals from a number of gaming regulatory authorities, including, among others, the Ak Chin Community Tribal Gaming Commission, the Arizona Department of Gaming, the Cherokee Tribal Gaming Commission, the Colorado Division of Gaming, the Illinois Gaming Board, the Indiana Gaming Commission, the Indiana Horse Racing Commission, the Iowa Racing and Gaming Commission, the Kentucky Horse Racing Commission, the Louisiana Gaming Control Board, the Louisiana State Racing Commission, the Maryland Lottery and Gaming Control Agency, the Mississippi Gaming Commission, the Missouri Gaming Commission, the National Indian Gaming Commission, the Nevada Gaming Commission, the New Jersey Casino Control Commission, the New Jersey Division of Gaming Enforcement, the Pennsylvania Gaming Control Board, the Pennsylvania State Horse Racing

26

*If the Merger is not consummated, the price of our common stock and our future businesses and operations could be harmed.*

If the Merger is not consummated, we will not have realized any of the potential benefits of the Merger having been consummated and may be subject to material risks, including:

- failure to consummate the Merger may result in negative publicity and a negative impression of us in the investment community;

- the diversion of management attention from day-to-day business and the unavoidable disruption to our employees and relationships with customers, vendors, joint venture partners and other third parties as a result of efforts and uncertainties relating to the Merger may detract from our ability to grow revenue and minimize costs, which, in turn, may lead to a loss of market position that we could be unable to regain if the Merger does not occur;

- under the Merger Agreement, we are subject to certain restrictions on the conduct of our business prior to consummating the Merger, which may affect our ability to execute certain of our business strategies or respond effectively to competitive pressures and industry developments; and

- in certain circumstances, we may be required to pay a termination fee of approximately $836.8 million to Caesars;

- we may be required to pay a $75.0 million termination fee to VICI pursuant to the terms of the MTA if the MTA is terminated as a result of the termination of the Merger Agreement;

- if our board of directors seeks an alternative transaction to the Merger, a potential third-party acquiror or merger partner may propose to pay a lower price to our stockholders as a result of the applicable termination fee and expense reimbursement;

- the price of our common stock may decline to the extent that the current market price of our common stock reflects a higher price than it otherwise would have based on the assumption that the Merger will be consummated;

- we would have incurred significant expenses relating to the Merger that we may be unable to recover; and

- we may be subject to litigation related to the failure to consummate the Merger or to perform our obligations under the Merger Agreement.

*The integration of the Company and Caesars following the Merger may present significant challenges. We cannot be sure that we will be able to realize the anticipated benefits of the Merger in the anticipated time frame or at all.*

Our ability to realize the anticipated benefits of the Merger will depend, to a large extent, on our ability to integrate Caesars' businesses into the Company in the anticipated time frame or at all. We may face significant challenges in combining Caesars' operations into our operations in a timely and efficient manner. The combination of two independent businesses is a complex, costly and time-consuming process. As a result, we will be required to devote significant management attention and resources to integrating the business practices and operations of Caesars into those of the Company. The integration process may disrupt the businesses and, if implemented ineffectively or inefficiently, would preclude realization of the full benefits expected by us and Caesars. The failure to successfully integrate Caesars into the Company and to manage the challenges presented by the integration process successfully may result in an interruption of, or loss of momentum in, the business of the Company, which may have the effect of depressing the market price of our common stock following the Merger.

*We may be unable to realize anticipated synergies or may incur additional costs.*

We expect to realize cost synergies and savings from the elimination of overlapping functions of Caesars and the Company, reduction of third party professional services and consulting expenses, and other targeted efficiencies. We further anticipate to benefit from revenue synergies. However, we will be required to incur costs, including severance and related expenses, to realize the anticipated synergies. In addition, the amount of synergies realized after consummation of the Merger may be reduced from anticipated levels as a result of cost reduction programs that have been implemented, or may be implemented, by Caesars prior to consummation of the Merger, including Caesars' previously announced cost saving initiatives which Caesars expects to result in annualized cost savings of at least $75 million. While our management believes the combined company will benefit from synergies, we may be unable to realize all of these synergies within the time frame expected or at all. In addition, we may incur additional or unexpected costs in order to realize these synergies.

29

# EXHIBIT 10

# EXHIBIT 10

# TRADE NAME APPROVAL SHEET
## ** KEEP WITH DOCUMENT **

# 100349521

```
1000362010682351
```

ID # T00349521 ACK # 1000362010682351
PAGES  0002
HORSESHOE BALTIMORE CASINO

08/18/2017   AT 10 29 A WO # 0004806269

## TRANSACTION TYPE          FEES REMITTED

TN – Trade Name Registration  _____
TA – Amendment  _____
TA1 – Amendment Owner Added  _____
TA2 – Amendment Owner Deleted  _____
TA3 – Amendment Owner Name Change  _____
TA4 – Amendment Location Added  _____
TA5 – Amendment Location Deleted  _____
TA6 – Amendment Location Changed  _____
TC – Cancellation  _____
TR – Renewal  _25_

_____ Certified Copies

_____ Certificates

Copy Fee _____

Certificate of Fact Fee _25_

TOTAL FEES _25_          Other Change(s) _____

Affix Text Label Here

## NO FEE TRANSACTION TYPES

99T – Departmental Action
99TA – Departmental Action – Name Change
220T – Void Non-Payment
220TA – Departmental Action – Amendment
220TA1 – Departmental Action – Owner Added
220TA2 – Departmental Action – Owner Deleted
220TA3 – Departmental Action – Owner Name Change
220TA4 – Departmental Action – Location Added
220TA5 – Departmental Action – Location Deleted
220TA6 – Departmental Action – Location Changed
220TC – Departmental Action – Cancellation
220TR – Departmental Action – Renewal

Code _____

Attention _____

Mail to Address

CAESARS LICENSE COMPANY, LLC
ATTN  LEGAL DEPARTMENT-JILL EATON
1 CAESARS PALACE DR
LAS VEGAS NV 89109-8969

Credit Card _____   Check _✓_   Cash _____

_____ Documents or _____ Checks

Approved By _____

Keyed By _____

COMMENT(S)

CUST ID 0003589692
WORK ORDER 0004806269
DATE 10-11-2017 09 55 AM
AMT  PAID $25 00

Stamp Work Order and
Customer Number HERE

State of Maryland
**Department of Assessments and Taxation**
Charter Division

## TRADE NAME AMENDMENT APPLICATION

38

FILING FEE· **$25.00**
EXPEDITED SERVICE FEE IS AN ADDITIONAL **$50.00**
(MAKE CHECKS PAYABLE TO DEPARTMENT OF ASSESSMENTS AND TAXATION)

TRADE NAME: *Horseshoe Baltimore Casino* 1003495
(LIST TRADE NAME EXACTLY AS FILED ON THE ORGINAL APPLICATION)

(ATTACH AN ADDITIONAL SHEET FOR ADDITIONAL INFORMATION AS NEEDED)

OWNERS NAME:

_____

CHANGING NAME          ADDING NAME          DELETING NAME

OWNERS ADDRESS·

TO: _____ *Attn: Legal Department - JILL EATON*

_____

CHANGING ADDRESS          (ADDING ADDRESS)          DELETING ADDRESS

ADDRESS WHERE NAME IS USED

TO· _____

_____

CHANGING ADDRESS          ADDING ADDRESS          DELETING ADDRESS

CHANGING DESCRIPTION OF BUSINESS:

_____

_____

** PLEASE NOTE. WHEN CHANGING OWNERS ADDRESS OR ADDRESS WHERE NAME IS USED, THE NEW ADDRESS
MUST CONTAIN A FULL STREET ADDRESS INCLUDING CITY, STATE AND ZIP CODE. IF THIS INFORMATION IS NOT
LISTED, THIS APPLICATION WILL BE REJECTED

*Neil Eaton*                              *Neil Eaton*    *Assistant Secretar*
SIGNATURE OF CURRENT OWNER ON FILE        SIGNATURE OF OWNER    (AUTHORIZED TITLE)

SIGNATURE OF OWNER        CUST ID 0003589692                    (AUTHORIZED TITLE)
                          WORK ORDER 0004806269
                          DATE.10-11-2017 09.55 AM
                          AMT. PAID $25 00

Phon                                           800-735-2258

# TRADE NAME APPROVAL SHEET
## ** EXPEDITED SERVICE **          ** KEEP WITH DOCUMENT **

1000362003666981

## TRANSACTION TYPE          FEES REMITTED

TN - Trade Name Registration          _25_
TA - Amendment
TA1 - Amendment Owner Added
TA2 - Amendment Owner Deleted
TA3 - Amendment Owner Name Change
TA4 - Amendment Location Added
TA5 - Amendment Location Deleted
TA6 - Amendment Location Changed
TC - Cancellation
TR - Renewal

Expedited Fee          _50_

_____ Certified Copies

_____ Certificates

Copy Fee: _____

Certificate of Fact Fee: _____

Other Change(s)

TOTAL FEES: _75_

## NO FEE TRANSACTION TYPES

99T - Departmental Action
99TA - Departmental Action - Name Change
220T - Void Non-Payment
220TA - Departmental Action - Amendment
220TA1 - Departmental Action - Owner Added
220TA2 - Departmental Action - Owner Deleted
220TA3 - Departmental Action - Owner Name Change
220TA4 - Departmental Action - Location Added
220TA5 - Departmental Action - Location Deleted
220TA6 - Departmental Action - Location Changed

Credit Card _____   Check _____   Cash _____

_____ Documents on _____ Checks

Approved By: _____

Keyed By: _____

COMMENT(S):

Affix Text Label Here
ID # T00349521 ACK # 1000362003666981
PAGES: 0002
HORSESHOE BALTIMORE CASINO

08/07/2012  AT 12:33 P WO # 0004008304

Code _____

Attention: _____

Mail to Address:

CAESARS LICENSE COMPANY, LLC
ONE CAESARS PALACE DRIVE
LAS VEGAS NV 89109

CUST ID:0002791724
WORK ORDER:0004008304
DATE:08-08-2012 11:38 AM
AMT. PAID:$75.00

Stamp Work Order and
Customer Number HERE

State of Maryland
## Department of Assessments and Taxation
Charter Division

## TRADE NAME APPLICATION

NON EXPEDITED FEE: $25.00
### EXPEDITED FEE: ADDITIONAL $50.00 | TOTAL EXPEDITED SERVICE: $75.00
(Make checks payable to Department of Assessments and Taxation)

**1) TRADE NAME:** *(Only one trade name may appear on this line)*

Horseshoe Baltimore Casino

**2) STREET ADDRESS(ES) WHERE NAME IS USED:**

One Caesars Palace Drive

**CITY:** Las Vegas          **STATE:** NV          **ZIP:** 89109
Post office box number is only accepted when part of the physical address.

**3) FULL LEGAL NAME OF OWNER OF BUSINESS OR INDIVIDUAL USING THE TRADE NAME:**

Caesars License Company, LLC                        *Z14488134*

If more than one owner, attach an additional sheet listing each owner with his/her address. Be sure each owner signs this form.

**4)** If the owner is an individual or general partnership, do they have a personal property account (an "L" number)?
Circle one:  YES  ×NO

IF YES, WHAT IS THAT NUMBER? _____

IF NO, see item 4 of the Trade Name Application Instructions.

**5) ADDRESS OF OWNER:** One Caesars Palace Drive

**CITY:** Las Vegas          **STATE:** NV          **ZIP:** 89109
Post office box number is only accepted when part of the physical address.

**6) DESCRIPTION OF BUSINES:** Holder of intellectual property of the company.

I affirm and acknowledge under penalties of perjury that the foregoing is true and correct to the best of my knowledge.

*Jill Eaton*   Assistant Secretary, Caesars Entertainment Operating Company, Inc.
SIGNATURE OF OWNER      (AUTHORIZED TITLE)        SIGNATURE OF OWNER      (AUTHORIZED TITLE)
The sole member of Caesars License Company, LLC

                                        SIGNATURE OF OWNER      (AUTHORIZED TITLE)

CUST ID:0002791724
WORK ORDER:0004008304
DATE:08-08-2012 11:38 AM          timore, Maryland 21201
AMT. PAID:$75.00                  rs call Maryland Relay 1-800-735-2258
                                  http://www.dat.state.md.us

*rev. 9/10*

# EXHIBIT 11

# EXHIBIT 11

# CORPORATE CHARTER APPROVAL SHEET

DOCUMENT CODE __45__   BUSINESS CODE __20__

\# _____

Close _____   Stock _____   Nonstock _____

P.A. _____   Religious _____

Merging (Transferor) _____

_____
_____
_____

Surviving (Transferee) _____

_____
_____
_____

```
1000352002076679
```

ID # Z14227482 ACK # 1000352002076679
PAGES: 0003
CAESARS BALTIMORE MANAGEMENT COMPANY, L
LC

07/27/2011  AT 08:30 A WO # 0003840977

New Name _____
_____
_____

## FEES REMITTED

| | |
|---|---|
| Base Fee: | _100_ |
| Org. & Cap. Fee: | |
| Expedite Fee: | _50_ |
| Penalty: | |
| State Recordation Tax: | |
| State Transfer Tax: | |
| Certified Copies | |
| Copy Fee: | |
| Certificates | |
| Certificate of Status Fee: | |
| Personal Property Filings: | |
| Mail Processing Fee: | |
| Other: | |
| **TOTAL FEES:** | _150_ |

_____ Change of Name
_____ Change of Principal Office
_____ Change of Resident Agent
_____ Change of Resident Agent Address
_____ Resignation of Resident Agent
_____ Designation of Resident Agent
         and Resident Agent's Address
_____ Change of Business Code

_____ Adoption of Assumed Name
_____

_____ Other Change(s)
_____
_____

Credit Card _____   Check _✓_   Cash _____

_1_ Documents on _1_ Checks

Code _871_

Attention: _____

Mail: Name and Address

Approved By: _03_  [signature]
Keyed By: [signature] _Sycwork_
COMMENT(S):

CORPORATION SERVICE COMPANY
STE 1660
7 ST. PAUL STREET
BALTIMORE MD 21202

## Stamp Work Order and Customer Number HERE

CUST ID:0002624387
WORK ORDER:0003840977
DATE:07-29-2011 03:03 PM
AMT. PAID:$150.00

# LIMITED LIABILITY COMPANY REGISTRATION

(for non-Maryland Limited Liability Company)

**1.)** FULL LEGAL NAME IN HOME JURISDICTION:

Caesars Baltimore Management Company, LLC

**2.)** NAME IT WILL USE IN MARYLAND IF DIFFERENT FROM ABOVE:

(MUST INCLUDE "LIMITED LIABILITY COMPANY", "LLC" or "LC")

**3.)** STATE OF FORMATION: Delaware

**4.)** DATE OF FORMATION: July 14, 2011

**5.)** ADDRESS IN STATE OF FORMATION:

2711 Centerville Road, Suite 400, Wilmington, DE 19808

**6.)** NATURE OF BUSINESS IN MARYLAND: Manage business operations and any other lawful limited liability
business purpose.

**7.)** NAME AND ADDRESS (NO P.O. BOXES) OF RESIDENT AGENT FOR SERVICE OF PROCESS IN MARYLAND:

CSC-Lawyers Incorporating Service Company

7 St. Paul Street, Suite 1660, Baltimore, MD 21202

IF NO RESIDENT AGENT IN MARYLAND IS NAMED OR IF THE AGENT CANNOT BE FOUND OR SERVED, THIS
DEPARTMENT IS APPOINTED AS RESIDENT AGENT OF THIS LIMITED LIABILITY COMPANY.

HAS THIS LIMITED LIABILITY COMPANY DONE BUSINESS IN MARYLAND PRIOR TO THIS REGISTRATION?

     YES   ✓ NO

(IF IT HAS, AN ADDITIONAL $200 PENALTY MUST ACCOMPANY THIS REGISTRATION)

SIGNED _____
                                     **Authorized Person**

I HEREBY CONSENT TO MY DESIGNATION IN THIS DOCUMENT AS RESIDENT AGENT FOR THIS LIMITED LIABILITY
COMPANY.

                                  CSC-Lawyers Incorporating Service Company

SIGNED _____
                                     **Resident Agent**

Revised 8/98

# Delaware

PAGE 1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "CAESARS BALTIMORE MANAGEMENT COMPANY, LLC" IS DULY FORMED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE TWENTY-SIXTH DAY OF JULY, A.D. 2011.

AND I DO HEREBY FURTHER CERTIFY THAT THE SAID "CAESARS BALTIMORE MANAGEMENT COMPANY, LLC" WAS FORMED ON THE FOURTEENTH DAY OF JULY, A.D. 2011.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL TAXES HAVE NOT BEEN ASSESSED TO DATE.

CUST ID:0002624397
WORK ORDER:0003840977
DATE:07-29-2011 03:03 PM
AMT. PAID:$150.00

5010803    8300

110860744

You may verify this certificate online
at corp.delaware.gov/authver.shtml

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 8928331

DATE: 07-26-11

# EXHIBIT 12

EXHIBIT 12

Southern Illinois Riverboat/Casino Cruises, Inc. dba Harrah's Metropolis Casino

## PUBLIC DISCLOSURE STATEMENT

**1. The name, business address and business telephone number of any applicant or licensee.**

Southern Illinois Riverboat/Casino Cruises, Inc. d/b/a Harrah's Metropolis Casino
100 East Front Street
Metropolis, IL 62960
(618) 524-2628

**2. An identification of any applicant or licensee including, if an applicant or licensee is not an individual, the state of incorporation or registration, the corporate officers, and the identity of all shareholders or participants. If an applicant or licensee has a pending registration statement filed with the Securities and Exchange Commission, only the names of those persons or entities holding interest of 5% or more must be provided.**

The licensee, Southern Illinois Riverboat/Casino Cruises, Inc. is a corporation incorporated in the State of Illinois, and its corporate directors and officers are:

Director and President                                  John W. R. Payne
Senior Vice President and General Manager               Randall H. Conroy

Southern Illinois Riverboat/Casino Cruises, Inc. is owned by Players Holding, LLC, which is owned by Players International, LLC, which is owned by Caesars Entertainment Operating Company, Inc., which is owned 89% by Caesars Entertainment Corporation, which is owned as disclosed in question 2 in its concurrently filed Public Disclosure Statement.

**3. An identification of any business, including, if applicable, the state of incorporation or registration, in which an applicant or licensee or an applicant's or licensee's spouse or children has an equity interest of more than 5%. If an applicant or licensee is a corporation, partnership or other business entity, the applicant or licensee shall identify any other corporation, partnership or business entity in which it has an equity interest of 5% or more, including, if applicable, the state of incorporation or registration. This information need not be provided by a corporation, partnership or other business entity that has a pending registration statement filed with the Securities and Exchange Commission.**

This question does not apply to the licensee, Southern Illinois Riverboat/Casino Cruises, Inc.

## Caesars Entertainment Corporation

Public Disclosure Statement

### List of Directors and Corporate Officers:

Directors:

Jeffrey Benjamin
David Bonderman
Kelvin Davis
Mark Frissora
Fred J. Kleisner
Gary W. Loveman
Eric Press
Marc Rowan
David Sambur
Christopher Williams

### Officers:

Jaqueline Beato
Susan Carletta
Keith Causey
Timothy R. Donovan
Jill Eaton
Mark Frissora
Eric Hession
Thomas M. Jenkin
Jan L. Jones
Robert Morse
Mary H. Thomas
Steven M. Tight
Scott E. Wiegand
Robert Gerber

*Gerber, Robert, Chief Restructuring Officer - This temporary position reports directly to the Strategic Alternatives Committee which consists of the independent directors of CEC. Mr. Gerber's responsibilities are limited to reporting to Strategic Alternatives Committee to help it carry out its responsibilities and do NOT include oversight or responsibility for any gaming operations nor will anyone with oversight or responsibilities for gaming operations report to Mr. Gerber.

# EXHIBIT 13

# EXHIBIT 13

Exhibit 21

## CAESARS ENTERTAINMENT
### LIST OF SUBSIDIARIES
As of February 25, 2020

| Name | Jurisdiction of Incorporation |
|---|---|
| 1300 WSED, LLC | Delaware |
| 1301 WSED, LLC | Maryland |
| 1400 WSED, LLC | Delaware |
| 3535 LV Corp. | Nevada |
| 3535 LV Newco, LLC | Delaware |
| AC Conference Holdco., LLC | Delaware |
| AC Conference Newco., LLC | Delaware |
| Aster Insurance Ltd. | Bermuda |
| Bally's Las Vegas Manager, LLC | Delaware |
| Bally's Park Place, LLC | New Jersey |
| Baluma Holdings S.A. | Bahamas |
| Benco, LLC | Nevada |
| BL Development, LLC | Minnesota |
| Boardwalk Regency LLC | New Jersey |
| Burlington Street Services Limited | England/Wales |
| BV Manager, LLC | Delaware |
| CA Hospitality Holding Company, Ltd. | British Virgin Islands |
| Caesars Asia Limited | Hong Kong |
| Caesars Bahamas Investment Corporation | Bahamas |
| Caesars Bahamas Management Corporation | Bahamas |
| Caesars Baltimore Acquisition Company, LLC | Delaware |
| Caesars Baltimore Investment Company, LLC | Delaware |
| Caesars Baltimore Management Company, LLC | Delaware |
| Caesars Dubai, LLC | Delaware |
| Caesars Enterprise Services, LLC [1] | Delaware |
| Caesars Entertainment Japan, LLC | Delaware |
| Caesars Entertainment UK Ltd. | United Kingdom |
| Caesars Entertainment Windsor Limited | Canada |
| Caesars Growth Bally's LV, LLC | Delaware |
| Caesars Growth Baltimore Fee, LLC | Delaware |
| Caesars Growth Cromwell, LLC | Delaware |
| Caesars Growth Harrah's New Orleans, LLC | Delaware |
| Caesars Growth Partners, LLC | Delaware |
| Caesars Growth PH Fee, LLC | Delaware |
| Caesars Growth PH, LLC | Delaware |
| Caesars Growth Quad, LLC | Delaware |
| Caesars Hospitality, LLC | Delaware |
| Caesars Interactive Entertainment New Jersey, LLC | Delaware |
| Caesars Interactive Entertainment, LLC | Delaware |
| Caesars International Hospitality, LLC | Delaware |
| Caesars Korea Holding Company, LLC | Delaware |
| Caesars Korea Services, LLC | Delaware |
| Caesars License Company, LLC | Nevada |
| Caesars Linq, LLC | Delaware |

1

| Name | Jurisdiction of Incorporation |
|---|---|
| Caesars Massachusetts Investment Company, LLC | Delaware |
| Caesars Mayfair Limited | England and Wales |
| Caesars Nevada Newco LLC | Nevada |
| Caesars New Jersey, LLC | New Jersey |
| Caesars Octavius, LLC | Delaware |
| Caesars Ontario Holding, Inc. | Canada |
| Caesars Palace LLC | Delaware |
| Caesars Palace Realty LLC | Nevada |
| Caesars Parlay Holding, LLC | Delaware |
| Caesars Resort Collection, LLC | Delaware |
| Caesars Riverboat Casino, LLC | Indiana |
| Caesars Trex, Inc. | Delaware |
| Caesars World International Corporation (S) PTE, Ltd. | Singapore |
| Caesars World International Far East Limited | Hong Kong |
| Caesars World, LLC | Florida |
| Caesars World Marketing LLC | New Jersey |
| Caesars World Merchandising, LLC | Nevada |
| California Clearing Corporation | California |
| Casino Computer Programming, Inc. | Indiana |
| CBAC Borrower, LLC | Delaware |
| CBAC Gaming, LLC (2) | Delaware |
| CBAC Holding Company, LLC | Delaware |
| Centaur Acquisition, LLC | Indiana |
| Centaur Colorado, LLC | Delaware |
| Centaur Holdings, LLC | Delaware |
| CEOC, LLC | Delaware |
| CH Management Company, Ltd. | Hong Kong |
| Chester Downs and Marina LLC | Pennsylvania |
| Chester Facility Holding Company, LLC | Delaware |
| Christian County Land Acquisition Company, LLC | Delaware |
| CIR Growth, LLC | Delaware |
| Corner Investment Company, LLC | Nevada |
| CPLV Manager, LLC | Delaware |
| CR Baltimore Holdings, LLC (3) | Delaware |
| CRC Finco, Inc. | Delaware |
| Cromwell Manager, LLC | Delaware |
| Dagger Holdings Ltd. | England |
| Des Plaines Development Limited Partnership (4) | Delaware |
| Desert Palace, LLC | Nevada |
| Eastside Convention Center, LLC | Delaware |
| Emerald Safari Resort (Pty) Limited (5) | South Africa |
| Entertainment RMG Canada, Inc. | Canada |
| Flamingo CERP Manager, LLC | Nevada |
| Flamingo Las Vegas Operating Company, LLC | Nevada |
| GB Investor, LLC | Delaware |
| Giles Road Developer, LLC | Delaware |
| Golden Nugget Club Limited | England/Wales |
| Grand Casinos of Biloxi, LLC | Minnesota |

2

| Name | Jurisdiction of Incorporation |
|------|-------------------------------|
| Grand Casinos, Inc. | Minnesota |
| Harrah South Shore Corporation | California |
| Harrah's Arizona Corporation | Nevada |
| Harrah's Atlantic City Operating Company, LLC | New Jersey |
| Harrah's Atlantic City Propco, LLC | Delaware |
| Harrah's Bossier City Investment Company, LLC | Louisiana |
| Harrah's Chester Downs Investment Company, LLC | Delaware |
| Harrah's Chester Downs Management Company, LLC | Nevada |
| Harrah's Illinois LLC | Nevada |
| Harrah's Interactive Investment Company | Nevada |
| Harrah's Iowa Arena Management, LLC | Delaware |
| Harrah's Las Vegas, LLC | Nevada |
| Harrah's Laughlin, LLC | Nevada |
| Harrah's Management Company | Nevada |
| Harrah's NC Casino Company, LLC | North Carolina |
| Harrah's New Orleans Management Company, LLC | Nevada |
| Harrah's North Kansas City LLC | Missouri |
| Harrah's Operating Company Memphis, LLC | Delaware |
| Harrah's Shreveport/Bossier City Investment Company, LLC | Delaware |
| Harveys BR Management Company, Inc. | Nevada |
| Harveys Iowa Management Company, LLC | Nevada |
| Harveys Tahoe Management Company, LLC | Nevada |
| HBR Realty Company, LLC | Nevada |
| HCAL, LLC | Nevada |
| HET International 1 B.V. | The Netherlands |
| HET International 2 B.V | The Netherlands |
| HLV CERP Manager, LLC | Nevada |
| Hole in the Wall, LLC | Nevada |
| Homerun Russia, LLC | Russia Federation |
| Hoosier Park, LLC | Indiana |
| Horseshoe Cincinnati Management, LLC | Delaware |
| Horseshoe Entertainment | Louisiana |
| Horseshoe Gaming Holding, LLC | Delaware |
| Horseshoe GP, LLC | Nevada |
| Horseshoe Hammond, LLC | Indiana |
| HP Dining & Entertainment, LLC | Indiana |
| HP Dining & Entertainment II, LLC | Indiana |
| HTM Holding, LLC | Nevada |
| Inter Casino Management (Egypt) Limited | Isle of Man |
| Jazz Casino Company, LLC | Louisiana |
| JCC Fulton Development, LLC | Louisiana |
| JCC Holding Company II, LLC | Delaware |
| JGB Vegas Retail Lessee, LLC [(i)] | Nevada |
| Joliet Manager, LLC | Delaware |
| Laughlin CERP Manager, LLC | Nevada |
| Laundry Newco, LLC | Delaware |
| LCI (Overseas) Investments (Pty) Ltd. | South Africa |
| Lifeboat, Inc. | Louisiana |

3

| Name | Jurisdiction of Incorporation |
|---|---|
| London Clubs (Overseas) Limited | England/Wales |
| London Clubs Brighton Limited | England/Wales |
| London Clubs Glasgow Limited | Scotland |
| London Clubs Holdings Limited | England/Wales |
| London Clubs International Limited | England/Wales |
| London Clubs Leeds Limited | England/Wales |
| London Clubs LSQ Limited | England/Wales |
| London Clubs Management Limited | England/Wales |
| London Clubs Manchester Limited | England/Wales |
| London Clubs Nottingham Limited | England/Wales |
| London Clubs Poker Room Limited | England/Wales |
| London Clubs South Africa Limited | England/Wales |
| London Clubs Southend Limited | England/Wales |
| London Clubs Trustee Limited | England/Wales |
| MVCE Middle East, LLC [7] | Dubai |
| New Centaur, LLC | Delaware |
| New Gaming Capital Partnership | Nevada |
| New Robinson Property Group, LLC | Delaware |
| Non-CPLV Manager, LLC | Delaware |
| Ocean Showboat, Inc. | New Jersey |
| Octavius/Linq Intermediate Holding, LLC | Delaware |
| Parball LLC | Nevada |
| Parball Newco, LLC | Delaware |
| Paris CERP Manager, LLC | Nevada |
| Paris Las Vegas Operating Company, LLC | Nevada |
| Parlay Solutions, LLC[8] | Delaware |
| PHW Las Vegas, LLC | Nevada |
| PHW Manager, LLC | Nevada |
| PHWCUP, LLC | Delaware |
| PHWLV, LLC | Nevada |
| Pier at Caesars LLC | New Jersey |
| Playboy Club (London) Limited | England/Wales |
| Players Bluegrass Downs, LLC | Kentucky |
| Players Holding, LLC | Nevada |
| Players International, LLC | Nevada |
| RFCZ (UK) Ltd. [9] | England |
| RFCZ Korea Corporation | Republic of Korea |
| Rio CERP Manager, LLC | Nevada |
| Rio Properties, LLC | Nevada |
| Robinson Property Group LLC | Mississippi |
| Roman Entertainment Corporation of Indiana | Indiana |
| Roman Holding Company of Indiana, LLC | Indiana |
| Romulus Risk and Insurance Company, Inc. | Nevada |
| Sharp Dressed Man Las Vegas, LLC | Nevada |
| Sharp Dressed Man Manager, LLC[10] | Nevada |
| Showboat Atlantic City Operating Company, LLC | New Jersey |
| Southern Illinois Riverboat/Casino Cruises, LLC | Illinois |
| Sterling Suffolk Racecourse, LLC [11] | Massachusetts |

4

| Name | Jurisdiction of Incorporation |
|---|---|
| The Caesars Foundation | Nevada |
| The Quad Manager, LLC | Delaware |
| The Sportsman Club Limited | England/Wales |
| Tunica Roadhouse LLC | Delaware |
| Vegas Development Land Owner, LLC | Delaware |
| Windsor Casino Limited | Canada |

| | |
|---|---|
| *1* | 69% CEOC, LLC; 31% Caesars Resort Collection, LLC |
| *2* | 75.8% CR Baltimore Holdings, LLC; 24.2% third party shareholders |
| *3* | 58.51% Caesars Baltimore Investment Company, LLC; 41.49% third party shareholders |
| *4* | 80% Harrah's Illinois LLC; 20% third party shareholder |
| *5* | 70% LCI (Overseas) Investments Pty Ltd.; 30% third party shareholders |
| *6* | 8.65% GB Investor, LLC; 91.35% third party shareholder |
| *7* | 49% Caesars Dubai LLC; 51% third party shareholder |
| *8* | 50% Caesars Parlay Holdings, LLC; 50% third party shareholder |
| *9* | 50% Caesars Korea Holding Company, LLC; 50% third party shareholder |
| *10* | 50% Caesars Hospitality, LLC; 50% third-party shareholder |
| *11* | 4.09% Caesars Massachusetts Investment Company, LLC; 95.91% third party shareholders |

5

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

We consent to the incorporation by reference in Registration Statement Nos. 333-182385, 333-204343, 333-211766, 333-220865, 333-220872, and 333-228792 on Form S-8, Registration Statement No. 333-216636 on Form S-4, and Registration Statement No. 333-180116 on Form S-3 of our reports dated February 25, 2020, relating to the financial statements of Caesars Entertainment Corporation and the effectiveness of Caesars Entertainment Corporation's internal control over financial reporting appearing in this Annual Report on Form 10-K for the year ended December 31, 2019.

/s/ DELOITTE & TOUCHE LLP
Las Vegas, Nevada
February 25, 2020

# EXHIBIT 14

# EXHIBIT 14



Maryland.gov

Help

MARYLAND BUSINESS

Want to PLAN, S MANAGE or C your bus › Click

Registrations & Filings

Business Search

## Business Entity Search

**Notice**

Coronavirus (COVID-19) resources for businesses: https://businessexpress.maryland.gov/coronavirus

On March 12th, Governor Hogan issued and executive order, which requires that the Maryland State Department of Assessments and Taxation (SDAT) to extend all expiration and renewal dates to the 30th day after the date by which the state of emergency is terminated. SDAT is automatically extending the Annual Report Filing and/or Personal Property Return filing date from April 15 to July 15th for all entities. SDAT will soon provide additional information related to the delay of due dates for trade name renewals/expirations, penalty due dates, and any other related items.

Business Name: horseshoe baltimore casino Search

Search by: Business Name Department ID

1 businesses found.

| Department ID | Business Name | Status |
|---|---|---|
| T00349521 | HORSESHOE BALTIMORE CASINO | Active |

Back

Fees Processing Times Business Resources Demo

© Maryland.gov. All rights reserved.

Privacy and Security Policy | Accessibility Policy

Maryland.gov

⊕ Help    🔒

MARYLAND
BUSINESS

Business Home

🔍 Business Search

HORSESHOE BALTIMORE CASINO: T00349521

⚠ Notice                                                                                  ✕

Coronavirus (COVID-19) resources for businesses: https://businessexpress.maryland.gov/coronavirus

On March 12th, Governor Hogan issued and executive order, which requires that the Maryland State Department of Assessments and Taxation (SDAT) to extend all expiration and renewal dates to the 30th day after the date by which the state of emergency is terminated. SDAT is automatically extending the Annual Report Filing and/or Personal Property Return filing date from April 15 to July 15th for all entities. SDAT will soon provide additional information related to the delay of due dates for trade name renewal/expirations, penalty due dates, and any other related items.

| General Information | Filing History |                                    Find It Fast |

## Filing History

The items listed below are associated with this business.
👁 – Click to view/print PDF (note: some items may not be available to view)
💬 – Click to view comment associated with this item

| Item | Date/Time Filed | Film | Folio | Pages |
|------|-----------------|------|-------|-------|
| 👁 CERTIFICATE OF AMENDMENT | 8/18/2017 10:25:00 AM | | | 2 |
| 👁 CERTIFICATE OF RENEWAL | 8/7/2017 3:48:00 PM | | | 2 |
| 💬 TRADE NAME REGISTRATION | 8/7/2012 12:33:00 PM | | | 2 |

🔍 New Search    Order Documents

🏷 Fees    🕐 Processing Times    📑 Business Resources    💻 Demo

© Maryland.gov. All rights reserved                    Privacy and Security Policy | Accessibility Policy                    💬 Ask Our Business Chatbot

Case 1:21-cv-00146-JHR Document 9 Filed 02/26/21 Page 94 of 119

The coronavirus outbreak has delayed the $17.3 billion deal between casino companies Caesars Entertainment and Eldorado Resorts, but the deal is moving forward, according to a source with firsthand knowledge.

Following a report on CNBC, Caesars was halted on the news and reopened up 12%.

Indiana, New Jersey and Nevada regulators still need to sign off on the deal but have postponed hearings. The merger also needs the approval of the Federal Trade Commission.

"The board is still investigating," said Nevada Gaming Commission Chair Tony Alamo. "The merger is going like any other merger. It's just going through the process, which includes a normal investigation," he added.

Eldorado and Caesars had anticipated closing in mid-April, but multiple sources have told CNBC it now looks more like June. There has been widespread speculation that the coronavirus pandemic will change the ways regulators view the debt associated with this deal. A highly placed source says both companies have the liquidity to last for well over a year.

Caesars has $3 billion on its balance sheet and recently sold the Rio in Las Vegas for $460 million. That was an unexpected source of cash and was not factored into the deal. Assuming a $230 million asset sale of two casinos in Mississippi and Missouri to Twin River closes, anticipated in the next 60 days, Eldorado will have roughly $850 million on hand, a source tells CNBC.



 

# EXHIBIT 9

# EXHIBIT 9

# Section 1: 10-K (10-K)

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**FORM 10-K**

(Mark One)

☒    ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2019

OR

☐    TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period        to

Commission File No. 001-36629

# ELDORADO RESORTS, INC.

(Exact name of registrant as specified in its charter)

| Nevada | | 46-3687681 |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | | (I.R.S. Employer Identification No.) |

100 West Liberty Street, Suite 1150
Reno, Nevada 89501
(Address of principal executive offices)
Telephone: (775) 328-0100
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading symbol | Name of each exchange on which registered |
|---|---|---|
| Common Stock, $.00001, par value | ERI | NASDAQ Stock Market |

Securities registered pursuant to section 12(g) of the Act:  None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).   Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☒ | | |
|---|---|---|---|
| Non-accelerated filer | ☐ | Accelerated filer | ☐ |
| Emerging growth company | ☐ | Smaller reporting company | ☐ |

If an emerging growth company, indicate by checkmark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

The aggregate market value of the common stock held by non-affiliates of the Registrant was $3.0 billion at June 28, 2019 based upon the closing price for the shares of ERI's common stock as reported by The Nasdaq Stock Market.

As of February 24, 2020, there were 77,796,891 outstanding shares of the Registrant's Common Stock, net of treasury shares.

**Documents Incorporated by Reference**

Portions of the Registrant's definitive proxy statement to be filed with the Commission pursuant to Regulation 14A in connection with the Registrant's Annual Meeting of Stockholders (the "Proxy Statement") are incorporated by reference into Part III of this report. Such Proxy Statement will be filed with the Commission not later than 120 days after the conclusion of the Registrant's fiscal year ended December 31, 2019.

*The Merger is subject to the receipt of governmental approvals that may impose conditions that could have an adverse effect on us or, if not obtained, could prevent consummation of the Merger or, in some circumstances, require us to pay Caesars a termination fee of approximately $836.8 million.*

Consummation of the Merger is conditioned upon the receipt of certain governmental approvals, including, without limitation, antitrust and gaming regulatory approvals. Although we and Caesars have each agreed to use our reasonable best efforts to obtain the requisite governmental approvals, there can be no assurance that these approvals will be obtained and that the other conditions to consummating the Merger will be satisfied. In addition, the governmental authorities from which the regulatory approvals are required may impose conditions on the consummation of the Merger, including requirements to divest properties, or require changes to the terms of the Merger Agreement or other agreements to be entered into in connection with the Merger Agreement. Such conditions or changes and the process of obtaining regulatory approvals could have the effect of delaying or impeding consummation of the Merger, imposing additional costs or limitations on us following consummation of the Merger or materially limiting the revenue of the combined company after the consummation of the Merger, any of which might reduce the anticipated benefits to us of the Merger or have an adverse effect on our business, financial condition and results of operations. In addition, if the Merger Agreement is terminated (i) due to a law or order relating to gaming or antitrust laws that prohibits or permanently enjoins the consummation of the Merger, (ii) because the required regulatory approvals were not obtained prior to June 24, 2020 (as may be extended to a date no later than December 24, 2020 upon satisfaction of certain conditions to extension set forth in the Merger Agreement) or (iii) due to us willfully and materially breaching certain obligations with respect to the actions required to be taken by us to obtain required antitrust approvals, we will be required to pay Caesars a termination fee of approximately $836.8 million.

*Antitrust approvals that are required to consummate the Merger may not be received, may take longer than expected or may impose conditions, including the requirement to divest assets, that could have an adverse effect on the combined company following the Merger.*

Under the provisions of the HSR Act, the Merger may not be consummated until filings are made with the Antitrust Division of the DOJ and the FTC and the expiration of a 30-calendar day waiting period, or the early termination of that waiting period, following the parties' filings. We and Caesars filed our respective notification and report forms under the HSR Act on July 16, 2019. On August 15, 2019, we withdrew our notification and report form and re-filed the same on August 19, 2019, which began a new 30-day waiting period. On September 18, 2019, each of we and Caesars received a Request for Additional Information and Documentary Material (a "Second Request") from the FTC in connection with the FTC's review of the Merger, which extends the waiting period until 30 days after both parties have substantially complied with the Second Request, unless the FTC early terminates the additional waiting period or the parties otherwise agree not to consummate the Merger for a period of time after substantial compliance. We and Caesars are working with the FTC to complete its investigation as soon as practicable.

In addition, private parties who may be adversely affected by the Merger and individual states may bring legal actions under the antitrust laws in certain circumstances. Although we and Caesars believe the consummation of the Merger will not likely be prevented by antitrust laws, there can be no assurance that a challenge to the Merger on antitrust grounds will not be made or, if a challenge is made, what the result will be. Under the Merger Agreement, we and Caesars have agreed to use our reasonable best efforts to obtain all regulatory clearances necessary to consummate the Merger at the earliest practicable date.

In addition, in order to consummate the Merger, we and Caesars may be required to comply with conditions, terms, obligations or restrictions imposed by antitrust, gaming and other regulatory entities, including divestitures, and such conditions, terms, obligations or restrictions may have the effect of delaying consummation of the Merger, imposing additional material costs on or materially limiting the revenue of the combined company after the consummation of the Merger, or otherwise reducing the anticipated benefits to us of the Merger. Such conditions, terms, obligations or restrictions may result in the delay or abandonment of the Merger.

*Gaming regulatory approvals may not be received, may take longer than expected or may impose conditions that are not presently anticipated or cannot be met.*

Consummation of the Merger is conditioned on the receipt of approvals from a number of gaming regulatory authorities, including, among others, the Ak Chin Community Tribal Gaming Commission, the Arizona Department of Gaming, the Cherokee Tribal Gaming Commission, the Colorado Division of Gaming, the Illinois Gaming Board, the Indiana Gaming Commission, the Indiana Horse Racing Commission, the Iowa Racing and Gaming Commission, the Kentucky Horse Racing Commission, the Louisiana Gaming Control Board, the Louisiana State Racing Commission, the Maryland Lottery and Gaming Control Agency, the Mississippi Gaming Commission, the Missouri Gaming Commission, the National Indian Gaming Commission, the Nevada Gaming Commission, the New Jersey Casino Control Commission, the New Jersey Division of Gaming Enforcement, the Pennsylvania Gaming Control Board, the Pennsylvania State Horse Racing

# EXHIBIT 10

# EXHIBIT 10

# TRADE NAME APPROVAL SHEET
## KEEP WITH DOCUMENT

# 100349521

|||||||||||||||||||||||||||||||||||||||||||||
1000362010682351

## TRANSACTION TYPE     FEES REMITTED

TN - Trade Name Registration
TA - Amendment
TA1 - Amendment Owner Added
TA2 - Amendment Owner Deleted
TA3 - Amendment Owner Name Change
TA4 - Amendment Location Added
TA5 - Amendment Location Deleted
TA6 - Amendment Location Changed
TC - Cancellation
TR - Renewal     25

_____ Certified Copies

_____ Certificates

Affix Text Label Here

ID # T00349521 ACK # 1000362010682351
PAGES 0002
HORSESHOE BALTIMORE CASINO

08/18/2017 AT 10 28 A NO # 0004806269

Copy Fee _____

Certificate of Fact Fee   25

TOTAL FEES   25

Other Change(s) _____

## NO FEE TRANSACTION TYPES

99T - Departmental Action
99TA - Departmental Action - Name Change
220T - Void Non-Payment
220TA - Departmental Action - Amendment
220TA1 - Departmental Action - Owner Added
220TA2 - Departmental Action - Owner Deleted
220TA3 - Departmental Action - Owner Name Change
220TA4 - Departmental Action - Location Added
220TA5 - Departmental Action - Location Deleted
220TA6 - Departmental Action - Location Changed
220TC - Departmental Action - Cancellation
220TR - Departmental Action - Renewal

Code _____

Attention _____

Mail to Address

CAESARS LICENSE COMPANY, LLC
ATTN LEGAL DEPARTMENT-JILL EATON
1 CAESARS PALACE DR
LAS VEGAS NV 89109-8969

Credit Card _____ Check ✓ Cash _____

_____ Documents or Checks

Approved By _____

Keyed By _____

COMMENT(S)

CUST ID 0003589692
WORK ORDER 0004806269
DATE 10-11-2017 09 55 AM
AMT PAID $25 00

Stamp Work Order and
Customer Number HERE

State of Maryland
Department of Assessments and Taxation
Charter Division

# TRADE NAME AMENDMENT APPLICATION

*38*

FILING FEE· **$25.00**
EXPEDITED SERVICE FEE IS AN ADDITIONAL **$50.00**
(MAKE CHECKS PAYABLE TO DEPARTMENT OF ASSESSMENTS AND TAXATION)

TRADE NAME: *Horseshoe Baltimore Casino*    *1003495*
(LIST TRADE NAME EXACTLY AS FILED ON THE ORGINAL APPLICATION)

(ATTACH AN ADDITIONAL SHEET FOR ADDITIONAL INFORMATION AS NEEDED)

OWNERS NAME:

| CHANGING NAME | ADDING NAME | DELETING NAME |

OWNERS ADDRESS·

TO: *Attn: Legal Department – JILL EATON*

| CHANGING ADDRESS | (ADDING ADDRESS) | DELETING ADDRESS |

ADDRESS WHERE NAME IS USED

TO·

| CHANGING ADDRESS | ADDING ADDRESS | DELETING ADDRESS |

CHANGING DESCRIPTION OF BUSINESS:

** PLEASE NOTE. WHEN CHANGING OWNERS ADDRESS OR ADDRESS WHERE NAME IS USED, THE NEW ADDRESS MUST CONTAIN A FULL STREET ADDRESS INCLUDING CITY, STATE AND ZIP CODE IF THIS INFORMATION IS NOT LISTED, THIS APPLICATION WILL BE REJECTED

SIGNATURE OF CURRENT OWNER ON FILE

SIGNATURE OF OWNER    *Assistant Secretary* (AUTHORIZED TITLE)

SIGNATURE OF OWNER    (AUTHORIZED TITLE)

CUST ID 0003589692
WORK ORDER 0004806269
DATE.10-11-2017 09.55 AM
AMT. PAID $25 00

Phone    800-735-2258

# TRADE NAME APPROVAL SHEET
## ** EXPEDITED SERVICE **     ** KEEP WITH DOCUMENT **

||||||||||| (barcode) |||||||||||
1000362003666981

## TRANSACTION TYPE          FEES REMITTED

TN - Trade Name Registration          25

TA - Amendment          _____

TA1 - Amendment Owner Added          _____

TA2 - Amendment Owner Deleted          _____

TA3 - Amendment Owner Name Change          _____

TA4 - Amendment Location Added          _____

TA5 - Amendment Location Deleted          _____

TA6 - Amendment Location Changed          _____

TC - Cancellation          _____

TR - Renewal          _____

Expedited Fee          50

_____ Certified Copies

_____ Certificates          Copy Fee: _____          _____ Other Charge(s)

Certificate of Fact Fee: _____

TOTAL FEES:     75

Affix Text Label Here
ID # T00349521 ACK # 1000362003666981
PAGES: 0002
HORSESHOE BALTIMORE CASINO

08/07/2012  AT 12:33 P WO # 0004008304

## NO FEE TRANSACTION TYPES

99T - Departmental Action

99TA - Departmental Action - Name Change

220T - Void Non-Payment

220TA - Departmental Action - Amendment

220TA1 - Departmental Action - Owner Added

220TA2 - Departmental Action - Owner Deleted

220TA3 - Departmental Action - Owner Name Change

220TA4 - Departmental Action - Location Added

220TA5 - Departmental Action - Location Deleted

220TA6 - Departmental Action - Location Changed

Code _____

Attention: _____

Mail to Address:

CAESARS LICENSE COMPANY, LLC
ONE CAESARS PALACE DRIVE
LAS VEGAS NV 89109

Credit Card _____     Check _____✓_____     Cash _____

_____ Documents on _____ Checks

Approved By: _____

Keyed By: _____

COMMENT(S):

CUST ID:0002791724
WORK ORDER:0004008304
DATE:08-08-2012 11:38 AM
AMT. PAID:$75.00

Stamp Work Order and
Customer Number HERE

State of Maryland

# Department of Assessments and Taxation

### Charter Division

## TRADE NAME APPLICATION

### NON EXPEDITED FEE: $25.00
### EXPEDITED FEE: ADDITIONAL $50.00 | TOTAL EXPEDITED SERVICE: $75.00
#### (Make checks payable to Department of Assessments and Taxation)

**1) TRADE NAME:** *(Only one trade name may appear on this line)*

Horseshoe Baltimore Casino

**2) STREET ADDRESS(ES) WHERE NAME IS USED:**

One Caesars Palace Drive

**CITY:** Las Vegas    **STATE:** NV    **ZIP:** 89109

Post office box number is only accepted when part of the physical address.

**3) FULL LEGAL NAME OF OWNER OF BUSINESS OR INDIVIDUAL USING THE TRADE NAME:**

Caesars License Company, LLC                        *Z14488134*

If more than one owner, attach an additional sheet listing each owner with his/her address. Be sure each owner signs this form.

**4)** If the owner is an individual or general partnership, do they have a personal property account (an "L" number)? Circle one:  YES  ✕NO

IF YES, WHAT IS THAT NUMBER? _____

IF NO, see item 4 of the Trade Name Application Instructions.

**5) ADDRESS OF OWNER:** One Caesars Palace Drive

**CITY:** Las Vegas    **STATE:** NV    **ZIP:** 89109

Post office box number is only accepted when part of the physical address.

**6) DESCRIPTION OF BUSINES:** Holder of intellectual property of the company.

I affirm and acknowledge under penalties of perjury that the foregoing is true and correct to the best of my knowledge.

*Jill Easton*    *Assistant Secretary, Caesars Entertainment Operating Company, Inc.*
SIGNATURE OF OWNER    (AUTHORIZED TITLE)    *the sole member of Caesars License Company, LLC*    SIGNATURE OF OWNER    (AUTHORIZED TITLE)

_____    _____
                                            SIGNATURE OF OWNER    (AUTHORIZED TITLE)

CUST ID:0002791724
WORK ORDER:0004008304
DATE:08-08-2012 11:38 AM
AMT. PAID:$75.00

ltimore, Maryland 21201
rs call Maryland Relay 1-800-735-2258
http://www.dat.state.md.us

*rev. 9/10*

# EXHIBIT 11

# EXHIBIT 11

# CORPORATE CHARTER APPROVAL SHEET
## **EXPEDITED SERVICE** ** KEEP WITH DOCUMENT **

DOCUMENT CODE __45__    BUSINESS CODE __20__

\# _____

Close _____    Stock _____    Nonstock _____

P.A. _____    Religious _____

Merging (Transferor) _____

_____

_____

_____

Surviving (Transferee) _____

_____

_____

```
ID # Z14227482 ACK # 1000362002076679
PAGES: 0003
CAESARS BALTIMORE MANAGEMENT COMPANY, L
LC

07/27/2011   AT 08:30 A WO # 0003840977
```

New Name _____

_____

### FEES REMITTED

| | |
|---|---|
| Base Fee: | _100_ |
| Org. & Cap. Fee: | |
| Expedite Fee: | _50_ |
| Penalty: | |
| State Recordation Tax: | |
| State Transfer Tax: | |
| Certified Copies | |
| Copy Fee: | |
| Certificates | |
| Certificate of Status Fee: | |
| Personal Property Filings: | |
| Mail Processing Fee: | |
| Other: | |
| **TOTAL FEES:** | _150_ |

_____ Change of Name
_____ Change of Principal Office
_____ Change of Resident Agent
_____ Change of Resident Agent Address
_____ Resignation of Resident Agent
_____ Designation of Resident Agent
          and Resident Agent's Address
_____ Change of Business Code

_____ Adoption of Assumed Name
          _____
          _____
_____ Other Change(s)
          _____
          _____

Credit Card _____    Check ✓    Cash _____

_1_ Documents on _1_ Checks

Code _871_

Attention: _____

Mail: Name and Address

Approved By: _03_ _____

Keyed By: _____

COMMENT(S):

```
CORPORATION SERVICE COMPANY
STE 1660
7 ST. PAUL STREET
BALTIMORE MD 21202
```

_____

### Stamp Work Order and Customer Number HERE

```
CUST ID:0002624397
WORK ORDER:0003840977
DATE:07-29-2011 03:03 PM
AMT. PAID:$150.00
```

# LIMITED LIABILITY COMPANY REGISTRATION

(for non-Maryland Limited Liability Company)

**1.)** FULL LEGAL NAME IN HOME JURISDICTION:

Caesars Baltimore Management Company, LLC

**2.)** NAME IT WILL USE IN MARYLAND IF DIFFERENT FROM ABOVE:

_____

(MUST INCLUDE "LIMITED LIABILITY COMPANY", "LLC" or "LC")

**3.)** STATE OF FORMATION: Delaware

**4.)** DATE OF FORMATION: July 14, 2011

**5.)** ADDRESS IN STATE OF FORMATION:

2711 Centerville Road, Suite 400, Wilmington, DE 19808

**6.)** NATURE OF BUSINESS IN MARYLAND: Manage business operations and any other lawful limited liability business purpose.

**7.)** NAME AND ADDRESS (NO P.O. BOXES) OF RESIDENT AGENT FOR SERVICE OF PROCESS IN MARYLAND:

CSC-Lawyers Incorporating Service Company

7 St. Paul Street, Suite 1660, Baltimore, MD 21202

IF NO RESIDENT AGENT IN MARYLAND IS NAMED OR IF THE AGENT CANNOT BE FOUND OR SERVED, THIS DEPARTMENT IS APPOINTED AS RESIDENT AGENT OF THIS LIMITED LIABILITY COMPANY.

HAS THIS LIMITED LIABILITY COMPANY DONE BUSINESS IN MARYLAND PRIOR TO THIS REGISTRATION?

YES   ✓ NO

(IF IT HAS, AN ADDITIONAL **$200 PENALTY** MUST ACCOMPANY THIS REGISTRATION)

SIGNED _____
Authorized Person

I HEREBY CONSENT TO MY DESIGNATION IN THIS DOCUMENT AS RESIDENT AGENT FOR THIS LIMITED LIABILITY COMPANY.

CSC-Lawyers Incorporating Service Company

SIGNED BY _____
Resident Agent

Revised 8/98

# Delaware

PAGE 1

### The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "CAESARS BALTIMORE MANAGEMENT COMPANY, LLC" IS DULY FORMED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE TWENTY-SIXTH DAY OF JULY, A.D. 2011.

AND I DO HEREBY FURTHER CERTIFY THAT THE SAID "CAESARS BALTIMORE MANAGEMENT COMPANY, LLC" WAS FORMED ON THE FOURTEENTH DAY OF JULY, A.D. 2011.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL TAXES HAVE NOT BEEN ASSESSED TO DATE.

```
CUST ID:0002624397
WORK ORDER:0003840977
DATE:07-29-2011 03:03 PM
AMT. PAID:$150.00
```

5010803   8300

110860744

You may verify this certificate online
at corp.delaware.gov/authver.shtml

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 8928331

DATE: 07-26-11

# EXHIBIT 12

# EXHIBIT 12

Southern Illinois Riverboat/Casino Cruises, Inc. dba Harrah's Metropolis Casino

## PUBLIC DISCLOSURE STATEMENT

**1.  The name, business address and business telephone number of any applicant or licensee.**

Southern Illinois Riverboat/Casino Cruises, Inc. d/b/a Harrah's Metropolis Casino
100 East Front Street
Metropolis, IL 62960
(618) 524-2628

**2.  An identification of any applicant or licensee including, if an applicant or licensee is not an individual, the state of incorporation or registration, the corporate officers, and the identity of all shareholders or participants. If an applicant or licensee has a pending registration statement filed with the Securities and Exchange Commission, only the names of those persons or entities holding interest of 5% or more must be provided.**

The licensee, Southern Illinois Riverboat/Casino Cruises, Inc. is a corporation incorporated in the State of Illinois, and its corporate directors and officers are:

| | |
|---|---|
| Director and President | John W. R. Payne |
| Senior Vice President and General Manager | Randall H. Conroy |

Southern Illinois Riverboat/Casino Cruises, Inc. is owned by Players Holding, LLC, which is owned by Players International, LLC, which is owned by Caesars Entertainment Operating Company, Inc., which is owned 89% by Caesars Entertainment Corporation, which is owned as disclosed in question 2 in its concurrently filed Public Disclosure Statement.

**3.  An identification of any business, including, if applicable, the state of incorporation or registration, in which an applicant or licensee or an applicant's or licensee's spouse or children has an equity interest of more than 5%. If an applicant or licensee is a corporation, partnership or other business entity, the applicant or licensee shall identify any other corporation, partnership or business entity in which it has an equity interest of 5% or more, including, if applicable, the state of incorporation or registration. This information need not be provided by a corporation, partnership or other business entity that has a pending registration statement filed with the Securities and Exchange Commission.**

This question does not apply to the licensee, Southern Illinois Riverboat/Casino Cruises, Inc.

## Caesars Entertainment Corporation

Public Disclosure Statement

## List of Directors and Corporate Officers:

Directors:

Jeffrey Benjamin
David Bonderman
Kelvin Davis
Mark Frissora
Fred J. Kleisner
Gary W. Loveman
Eric Press
Marc Rowan
David Sambur
Christopher Williams

## Officers:

Jaqueline Beato
Susan Carletta
Keith Causey
Timothy R. Donovan
Jill Eaton
Mark Frissora
Eric Hession
Thomas M. Jenkin
Jan L. Jones
Robert Morse
Mary H. Thomas
Steven M. Tight
Scott E. Wiegand
Robert Gerber

*Gerber, Robert, Chief Restructuring Officer - This temporary position reports directly to the Strategic Alternatives Committee which consists of the independent directors of CEC.   Mr. Gerber's responsibilities are limited to reporting to Strategic Alternatives Committee to help it carry out its responsibilities and do NOT include oversight or responsibility for any gaming operations nor will anyone with oversight or responsibilities for gaming operations report to Mr. Gerber.

# EXHIBIT 13

# EXHIBIT 13

Exhibit 21

# CAESARS ENTERTAINMENT CORPORATION
## LIST OF SUBSIDIARIES
### As of February 25, 2020

| Name | Jurisdiction of Incorporation |
|------|------------------------------|
| 1300 WSED, LLC | Delaware |
| 1301 WSED, LLC | Maryland |
| 1400 WSED, LLC | Delaware |
| 3535 LV Corp. | Nevada |
| 3535 LV Newco, LLC | Delaware |
| AC Conference Holdco., LLC | Delaware |
| AC Conference Newco., LLC | Delaware |
| Aster Insurance Ltd. | Bermuda |
| Bally's Las Vegas Manager, LLC | Delaware |
| Bally's Park Place, LLC | New Jersey |
| Bahama Holdings S.A. | Bahamas |
| Benco, LLC | Nevada |
| BL Development, LLC | Minnesota |
| Boardwalk Regency LLC | New Jersey |
| Burlington Street Services Limited | England/Wales |
| BV Manager, LLC | Delaware |
| CA Hospitality Holding Company, Ltd. | British Virgin Islands |
| Caesars Asia Limited | Hong Kong |
| Caesars Bahamas Investment Corporation | Bahamas |
| Caesars Bahamas Management Corporation | Bahamas |
| Caesars Baltimore Acquisition Company, LLC | Delaware |
| Caesars Baltimore Investment Company, LLC | Delaware |
| Caesars Baltimore Management Company, LLC | Delaware |
| Caesars Dubai, LLC | Delaware |
| Caesars Enterprise Services, LLC [1] | Delaware |
| Caesars Entertainment Japan, LLC | Delaware |
| Caesars Entertainment UK Ltd. | United Kingdom |
| Caesars Entertainment Windsor Limited | Canada |
| Caesars Growth Bally's LV, LLC | Delaware |
| Caesars Growth Baltimore Fee, LLC | Delaware |
| Caesars Growth Cromwell, LLC | Delaware |
| Caesars Growth Harrah's New Orleans, LLC | Delaware |
| Caesars Growth Partners, LLC | Delaware |
| Caesars Growth PH Fee, LLC | Delaware |
| Caesars Growth PH, LLC | Delaware |
| Caesars Growth Quad, LLC | Delaware |
| Caesars Hospitality, LLC | Delaware |
| Caesars Interactive Entertainment New Jersey, LLC | Delaware |
| Caesars Interactive Entertainment, LLC | Delaware |
| Caesars International Hospitality, LLC | Delaware |
| Caesars Korea Holding Company, LLC | Delaware |
| Caesars Korea Services, LLC | Delaware |
| Caesars License Company, LLC | Nevada |
| Caesars Linq, LLC | Delaware |

| Name | Jurisdiction of Incorporation |
|---|---|
| Caesars Massachusetts Investment Company, LLC | Delaware |
| Caesars Mayfair Limited | England and Wales |
| Caesars Nevada Newco LLC | Nevada |
| Caesars New Jersey, LLC | New Jersey |
| Caesars Octavius, LLC | Delaware |
| Caesars Ontario Holding, Inc. | Canada |
| Caesars Palace LLC | Delaware |
| Caesars Palace Realty LLC | Nevada |
| Caesars Parlay Holding, LLC | Delaware |
| Caesars Resort Collection, LLC | Delaware |
| Caesars Riverboat Casino, LLC | Indiana |
| Caesars Trex, Inc. | Delaware |
| Caesars World International Corporation (S) PTE, Ltd. | Singapore |
| Caesars World International Far East Limited | Hong Kong |
| Caesars World, LLC | Florida |
| Caesars World Marketing LLC | New Jersey |
| Caesars World Merchandising, LLC | Nevada |
| California Clearing Corporation | California |
| Casino Computer Programming, Inc. | Indiana |
| CBAC Borrower, LLC | Delaware |
| CBAC Gaming, LLC (2) | Delaware |
| CBAC Holding Company, LLC | Delaware |
| Centaur Acquisition, LLC | Indiana |
| Centaur Colorado, LLC | Delaware |
| Centaur Holdings, LLC | Delaware |
| CEOC, LLC | Delaware |
| CH Management Company, Ltd. | Hong Kong |
| Chester Downs and Marina LLC | Pennsylvania |
| Chester Facility Holding Company, LLC | Delaware |
| Christian County Land Acquisition Company, LLC | Delaware |
| CIE Growth, LLC | Delaware |
| Comer Investment Company, LLC | Nevada |
| CPLV Manager, LLC | Delaware |
| CR Baltimore Holdings, LLC (3) | Delaware |
| CRC Finco, Inc. | Delaware |
| Cromwell Manager, LLC | Delaware |
| Dagger Holdings Ltd. | England |
| Des Plaines Development Limited Partnership (4) | Delaware |
| Desert Palace, LLC | Nevada |
| Eastside Convention Center, LLC | Delaware |
| Emerald Safari Resort (Pty) Limited (5) | South Africa |
| Entertainment RMG Canada, Inc. | Canada |
| Flamingo CERP Manager, LLC | Nevada |
| Flamingo Las Vegas Operating Company, LLC | Nevada |
| GB Investor, LLC | Delaware |
| Giles Road Developer, LLC | Delaware |
| Golden Nugget Club Limited | England/Wales |
| Grand Casinos of Biloxi, LLC | Minnesota |

2

| Name | Jurisdiction of Incorporation |
|------|-------------------------------|
| Grand Casinos, Inc. | Minnesota |
| Harrah South Shore Corporation | California |
| Harrah's Arizona Corporation | Nevada |
| Harrah's Atlantic City Operating Company, LLC | New Jersey |
| Harrah's Atlantic City Propco, LLC | Delaware |
| Harrah's Bossier City Investment Company, LLC | Louisiana |
| Harrah's Chester Downs Investment Company, LLC | Delaware |
| Harrah's Chester Downs Management Company, LLC | Nevada |
| Harrah's Illinois LLC | Nevada |
| Harrah's Interactive Investment Company | Nevada |
| Harrah's Iowa Arena Management, LLC | Delaware |
| Harrah's Las Vegas, LLC | Nevada |
| Harrah's Laughlin, LLC | Nevada |
| Harrah's Management Company | Nevada |
| Harrah's NC Casino Company, LLC | North Carolina |
| Harrah's New Orleans Management Company, LLC | Nevada |
| Harrah's North Kansas City LLC | Missouri |
| Harrah's Operating Company Memphis, LLC | Delaware |
| Harrah's Shreveport/Bossier City Investment Company, LLC | Delaware |
| Harveys BR Management Company, Inc. | Nevada |
| Harveys Iowa Management Company, LLC | Nevada |
| Harveys Tahoe Management Company, LLC | Nevada |
| HBR Realty Company, LLC | Nevada |
| HCAL, LLC | Nevada |
| HET International 1 B.V. | The Netherlands |
| HET International 2 B.V | The Netherlands |
| HLV CERP Manager, LLC | Nevada |
| Hole in the Wall, LLC | Nevada |
| Homerun Russia, LLC | Russia Federation |
| Hoosier Park, LLC | Indiana |
| Horseshoe Cincinnati Management, LLC | Delaware |
| Horseshoe Entertainment | Louisiana |
| Horseshoe Gaming Holding, LLC | Delaware |
| Horseshoe GP, LLC | Nevada |
| Horseshoe Hammond, LLC | Indiana |
| HP Dining & Entertainment, LLC | Indiana |
| HP Dining & Entertainment II, LLC | Indiana |
| HTM Holding, LLC | Nevada |
| Inter Casino Management (Egypt) Limited | Isle of Man |
| Jazz Casino Company, LLC | Louisiana |
| JCC Fulton Development, LLC | Louisiana |
| JCC Holding Company II, LLC | Delaware |
| JGB Vegas Retail Lessee, LLC (6) | Nevada |
| Joliet Manager, LLC | Delaware |
| Laughlin CERP Manager, LLC | Nevada |
| Laundry Newco, LLC | Delaware |
| LCI (Overseas) Investments (Pty) Ltd. | South Africa |
| Lifeboat, Inc. | Louisiana |

3

| Name | Jurisdiction of Incorporation |
|---|---|
| London Clubs (Overseas) Limited | England/Wales |
| London Clubs Brighton Limited | England/Wales |
| London Clubs Glasgow Limited | Scotland |
| London Clubs Holdings Limited | England/Wales |
| London Clubs International Limited | England/Wales |
| London Clubs Leeds Limited | England/Wales |
| London Clubs LSQ Limited | England/Wales |
| London Clubs Management Limited | England/Wales |
| London Clubs Manchester Limited | England/Wales |
| London Clubs Nottingham Limited | England/Wales |
| London Clubs Poker Room Limited | England/Wales |
| London Clubs South Africa Limited | England/Wales |
| London Clubs Southend Limited | England/Wales |
| London Clubs Trustee Limited | England/Wales |
| MVCE Middle East, LLC [7] | Dubai |
| New Centaur, LLC | Delaware |
| New Gaming Capital Partnership | Nevada |
| New Robinson Property Group, LLC | Delaware |
| Non-CPLV Manager, LLC | Delaware |
| Ocean Showboat, Inc. | New Jersey |
| Octavius/Linq Intermediate Holding, LLC | Delaware |
| Parball LLC | Nevada |
| Parball Newco, LLC | Delaware |
| Paris CERP Manager, LLC | Nevada |
| Paris Las Vegas Operating Company, LLC | Nevada |
| Parlay Solutions, LLC [8] | Delaware |
| PHW Las Vegas, LLC | Nevada |
| PHW Manager, LLC | Nevada |
| PHWCUP, LLC | Delaware |
| PHWLV, LLC | Nevada |
| Pier at Caesars LLC | New Jersey |
| Playboy Club (London) Limited | England/Wales |
| Players Bluegrass Downs, LLC | Kentucky |
| Players Holding, LLC | Nevada |
| Players International, LLC | Nevada |
| RFCZ (UK) Ltd. [9] | England |
| RFCZ Korea Corporation | Republic of Korea |
| Rio CERP Manager, LLC | Nevada |
| Rio Properties, LLC | Nevada |
| Robinson Property Group LLC | Mississippi |
| Roman Entertainment Corporation of Indiana | Indiana |
| Roman Holding Company of Indiana, LLC | Indiana |
| Romulus Risk and Insurance Company, Inc. | Nevada |
| Sharp Dressed Man Las Vegas, LLC | Nevada |
| Sharp Dressed Man Manager, LLC [10] | Nevada |
| Showboat Atlantic City Operating Company, LLC | New Jersey |
| Southern Illinois Riverboat/Casino Cruises, LLC | Illinois |
| Sterling Suffolk Racecourse, LLC [11] | Massachusetts |

4

| Name | Jurisdiction of Incorporation |
|---|---|
| The Caesars Foundation | Nevada |
| The Quad Manager, LLC | Delaware |
| The Sportsman Club Limited | England/Wales |
| Tunica Roadhouse LLC | Delaware |
| Vegas Development Land Owner, LLC | Delaware |
| Windsor Casino Limited | Canada |

1   69% CEOC, LLC; 31% Caesars Resort Collection, LLC
2   75.8% CR Baltimore Holdings, LLC; 24.2% third party shareholders
3   58.51% Caesars Baltimore Investment Company, LLC; 41.49% third party shareholders
4   80% Harrah's Illinois LLC; 20% third party shareholder
5   70% LCI (Overseas) Investments Pty Ltd.; 30% third party shareholders
6   8.65% GB Investor, LLC; 91.35% third party shareholder
7   49% Caesars Dubai LLC; 51% third party shareholder
8   50% Caesars Parlay Holdings, LLC; 50% third party shareholder
9   50% Caesars Korea Holding Company, LLC; 50% third party shareholder
10  50% Caesars Hospitality, LLC; 50% third-party shareholder
11  4.09% Caesars Massachusetts Investment Company, LLC; 95.91% third party shareholders

Exhibit 23

## CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We consent to the incorporation by reference in Registration Statement Nos. 333-182385, 333-204343, 333-211766, 333-220865, 333-220872, and 333-228792 on Form S-8, Registration Statement No. 333-216636 on Form S-4, and Registration Statement No. 333-180116 on Form S-3 of our reports dated February 25, 2020, relating to the financial statements of Caesars Entertainment Corporation and the effectiveness of Caesars Entertainment Corporation's internal control over financial reporting appearing in this Annual Report on Form 10-K for the year ended December 31, 2019.

/s/ DELOITTE & TOUCHE LLP
Las Vegas, Nevada
February 25, 2020

# EXHIBIT 14

# EXHIBIT 14



Maryland.gov                                                                                                     ⊕ Help  🔒

## MARYLAND BUSINESS

### Registrations & Filings

🔍 Business Search

**Business Entity Search**

⚠ **Notice**                                                                                        ✕

Coronavirus (COVID-19) resources for businesses: https://businessexpress.maryland.gov/coronavirus

On March 12th, Governor Hogan issued and executive order, which requires that the Maryland State Department of Assessments and Taxation (SDAT) to extend all expiration and renewal dates to the 30th day after the date by which the state of emergency is terminated. SDAT is automatically extending the Annual Report Filing and/or Personal Property Return filing date from April 15 to July 15th for all entities. SDAT will soon provide additional information related to the delay of due dates for trade name renewals/expirations, penalty due dates, and any other related items.

Business Name:   horseshoe baltimore casino        🔍 Search.

Search by:  ⦿ Business Name
            ○ Department ID

1 businesses found.

| Department ID | Business Name | Status |
|---|---|---|
| T00349521 | HORSESHOE BALTIMORE CASINO | Active |

◀◀ Back

🎫 Fees          🕐 Processing Times          📋 Business Resources          📹 Demo

⊕ Maryland.gov. All rights reserved.                    Privacy and Security Policy | Accessibility Policy



**Maryland.gov**

⊕ Help ⋅ 🔒

MARYLAND
BUSINESS

Business Home

🔍 Business Search

### HORSESHOE BALTIMORE CASINO: T00349521

⚠ Notice                                                                    ✕

Coronavirus (COVID-19) resources for businesses: https://businessexpress.maryland.gov/coronavirus

On March 12th, Governor Hogan issued and executive order, which requires that the Maryland State Department of Assessments and Taxation (SDAT) to extend all expiration and renewal dates to the 30th day after the date by which the state of emergency is terminated. SDAT is automatically extending the Annual Report Filing and/or Personal Property Return filing date from April 15 to July 15th for all entities. SDAT will soon provide additional information related to the delay of due dates for trade name renewals/expirations, penalty due dates, and any other related items.

| General Information | Filing History |                                    Print It Fast ∨ |

## Filing History

The items listed below are associated with this business.
👁 – Click to view/print PDF (note: some items may not be available to view)
💬 – Click to view comment associated with this item

| Item | | Date/Time Filed | Film | Folio | Pages |
|------|--|-----------------|------|-------|-------|
| 👁 | CERTIFICATE OF AMENDMENT | 8/18/2017 10:29:00 AM | | | 2 |
| 👁 | CERTIFICATE OF RENEWAL | 8/7/2017 3:45:00 PM | | | 2 |
| 👁 | TRADE NAME REGISTRATION | 8/7/2012 12:33:00 PM | | | 2 |

🔍 New Search    Order Documents

🏛 Fees    ⏱ Processing Times    📖 Business Resources    🎬 Demo

© Maryland.gov. All rights reserved    Privacy and Security Policy | Accessibility Policy    💬 Ask Our Business Chatbot